JOHN R. HANSEN, INC., *Respondent*, v. PACIFIC INTERNATIONAL CORPORATION, *Appellant*.*

*Nickell, Quinn & Tuai*, by *Liem E. Tuai*, for appellant.

*Kenneth A. Cole, Richard C. Nelson*, and *Cole, Chapin, O'Connell & Nelson*, for respondent.

DONWORTH, J. † —This case is concerned with the respective rights of the seller and the purchaser, who executed a real estate contract on April 30, 1966 for the sale of certain real property situated 2 miles north of Kirkland in King County for a consideration of $899,091, payable in specified periodic installments. Each party is a Washington corporation, whose stock is owned or controlled by one person.

*Reported in 455 P.2d 946.

†Judge Donworth is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

The seller is John R. Hansen, Inc., herein referred to as respondent, whose president is John R. Hansen. The purchaser is Pacific International Corporation, herein referred to as appellant, whose president is Paul N. Woo.

For several years prior to the execution of the contract, respondent had developed and had been operating a shopping center on a portion of the subject property known as Juanita Shopping Village. Among the 11 tenants were Mayfair Supermarket and a branch office of Seattle First National Bank. Included in the sale (in addition to the Village) were three vacant parcels of land which respondent was acquiring by contract with their respective owners.[1]

To finance the construction of the Village, respondent, in 1964, obtained a mortgage loan from the Equitable Assurance Society (herein referred to as Equitable) in the principal sum of $500,000, bearing interest at the rate of 5½ per cent per annum. The note signed by respondent called for monthly payments of $4,088 (to be applied first to payment of accrued interest, and the balance to principal). The principal balance on the mortgage on April 30, 1966 was $462,465.14.

The contract of sale between respondent and appellant provided for an initial payment of $75,000 by appellant, and monthly payments of $6,488. Of this sum $4,088 was to be applied to the payments due on the Equitable mortgage (referred to above), and $2,400 was payable to respondent.[2]

Under the terms of the contract of sale, respondent was to retain all lease deposits made by existing tenants, and appellant was to receive all rentals payable by them pursuant to their leases. The lease deposits totalled $4,091, and this sum was credited as an additional initial payment on the contract.

---

[1] It was stipulated at the trial that the present value of the real property owned by respondent was between $1,000,000 and $1,100,000. The value of the three vacant parcels being acquired by respondent was estimated by Mr. Hansen at $248,000.

[2] In addition to the monthly payments the contract provided for three "balloon" payments as follows: $25,000 on May 1, 1967; $15,000 on November 1, 1967 and $24,000 on February 1, 1972.

The contract contained provisions for the payment, by appellant, before delinquency of all taxes and assessments that might become a lien upon the property. It also provided that appellant should keep the premises insured against certain risks; that it should pay for all utility services; and that it should keep the buildings and other improvements on the property in good repair and not permit waste.

The provisions of the contract relating to notices of default and forfeiture are as follows:

> Time is of the essence of this contract, and it is agreed that in case the purchaser shall fail to comply with or perform any condition or agreement hereof or to make any payment required hereunder promptly at the time and in the manner herein required, the seller may elect to declare all the purchaser's rights hereunder terminated, and upon his doing so, all payments made by the purchaser hereunder and all improvements placed upon the real estate shall be forfeited to the seller as liquidated damages, and the seller shall have right to re-enter and take possession of the real estate; and no waiver by the seller of any default on the part of the purchaser shall be construed as a waiver of any subsequent default.

> Service upon purchaser of all demands, notices or other papers with respect to forfeiture and termination of purchaser's rights may be made by United States Mail, postage pre-paid, return receipt requested, directed to the purchaser at his address last known to the seller.

Possession of the property was given appellant on May 1, 1966, and it operated the Village thereafter until respondent, in July, 1968, claimed that appellant was in default in its failure to pay the monthly payment of $2,400. During the 2-year period that appellant was operating the property, two new tenants were added to the original 11 who leased space from respondent.

The contract required all rental payments to be paid to the Seattle First National Bank. When the bank received the rental payments of $6,488 per month, it dispersed this money as follows: (a) $4,088 to Equitable to be credited on the mortgage note; (b) $2,400 to respondent to be applied: $1,400 in monthly contract payments in accordance

with the real estate contracts under which respondent was acquiring the three unimproved tracts in the area, and $1,000 to be retained by respondent.

On July 8, 1968 the bank, by letter, advised appellant that it had insufficient funds to pay either the $2,400 item or the $4,088 monthly payment due on the Equitable mortgage.

On July 12, 1968, respondent notified appellant by letter that unless payments in default under the real estate contract were made by August 1, 1968, respondent would elect to declare a forfeiture and cancel the contract pursuant to the provisions of the contract. The letter specified the payments in default as follows:

> Defaults referred to above are the failure to make the monthly installment due on the first day of July, 1968, to pay the Real Estate Taxes and to keep sufficient funds in the account, to make current payments on the mortgage on the property.

The failure to make the July monthly installment payment on the real estate contract was cured by the subsequent acceptance by respondent of a cash payment on or about July 15, 1968. During the trial, respondent's counsel stated it was no longer relying upon the delinquency of the monthly installment payments under the contract as a basis for forfeiture.

Additionally, on July 17, 1968, respondent received from Equitable a formal notice that the 1967 real estate taxes on the property were delinquent in the amount of $13,395.50. On August 7, 1968, Equitable sent the following letter to respondent:

> It has come to our attention that the real estate taxes on the above property are delinquent for the years 1967 and 1968 in a total reported amount of $34,644.90, plus penalty interest.
>
> Please be advised that if these delinquencies have not been cured by payment to the County Treasurer within 30 days of today's date, we will [sic] obliged to refer the matter to our attorneys for appropriate action.

Prior to the latter notice on August 7th, appellant's coun-

sel wrote the assistant secretary of respondent corporation on July 26, 1968 and advised him that the real estate taxes would be paid prior to October 31, 1968. This request for an extension, however, was denied by respondent corporation. Respondent advised appellant's counsel by letter dated July 29, 1968, that unless the delinquency in real estate ad valorem taxes was cured by August 1, 1968, respondent would proceed with its intention to declare a forfeiture and cancel the contract. Subsequent efforts by appellant to get respondent to acquiesce in an extension until the end of August were also denied by respondent.

On August 1, 1968 respondent wrote to appellant declaring a forfeiture and cancellation of the contract. The first paragraph of the communication read as follows:

> You are hereby notified that by reason of your default under the contract hereinafter referred to, and your failure to make good your default in accordance with the notice heretofore given to you, the undersigned has declared to elect a forfeiture of and cancel that contract, and has declared a forfeiture of and cancelled the contract, and you are hereby required forthwith to quit and surrender possession of the premises.

On August 5, 1968 appellant's counsel wrote a letter to respondent's counsel in which he enclosed the monthly payment for August under the contract. He also notified him that the mortgage payment for that month had been made to Equitable. In response thereto, respondent's counsel sent the following letter in reply:

> I am in receipt of your letter of August 5, 1968, and return herewith Cashier's Check No. 08532192, issued by the Seattle-First National Bank, to John R. Hansen, Inc., for the sum of $2,400.00, as we have been instructed to accept no payments while the purchaser is in default of any terms of the contract.

> Mr. Hansen has checked with Equitable Life Assurance Society, mortgagees, and has confirmed the information contained in your letter relative to a recent $4,088.00 payment on the mortgage. We enclose herewith Mr. Hansen's check in like amount in reimbursement of the amount received by the Mortgage Company and applied upon the mortgage. We had heretofore given the Mort-

gage Company directions not to receive any further payments but, as explained, the payment was received from Pacific International Co. at a time when the regular cashier was off duty and the payment inadvertently accepted.

We have also communicated your request to Mr. Hansen to permit your client an extension to the end of the month in which to catch up all delinquencies. Mr. Hansen has replied that he does not wish to reinstate the contract and receive payments and would request that the purchasers refinance the contract and pay off the outstanding balance. His feeling in this respect is attributable in part to numerous complaints that he has heard from the tenants of the building with respect to the way the purchasers are permitting the premises to run down.

On August 12, 1968, respondent instituted the present action by filing its complaint which was designated as "Complaint Forfeiting Real Estate Contract." In paragraph 5 of the aforesaid complaint, respondent alleged its grounds for obtaining a judgment declaring the contract forfeited and extinguishing forever appellant's rights thereunder as follows:

V

Defendant is delinquent in the payments called for in Exhibit "A", [i.e., the real estate contract] and its obligations towards plaintiff under the terms and conditions of said real estate contract are now in default.

It is to be noted that there is no specific allegation as to which particular payments and obligations, under the contract, appellant was charged with its failure to perform.

Appellant's answer denied the principal allegations of the complaint and by way of affirmative defense alleged:

By Way of Further Answer, Defendant Alleges that any default on its part has been cured by the tender of moneys to John R. Hansen and/or to the plaintiff's attorneys, who have refused the same. The sum of $40,837.86, the amount plaintiff claims that defendant is delinquent, has been placed into the registry of the court. Defendant is willing and able to place such additional sums into the registry of the court at such time as plaintiff or its attorneys notify defendant or its attorneys of

the amount said to be owed and the reason therefor pending final determination of this action and the disbursement of the said funds in accordance with the court's order.

Plaintiff has waived or is estopped to demand strict performance of the real estate contract in question.

On September 16, 1968 respondent filed an amended complaint in which it inserted a new paragraph immediately following paragraph 5 quoted above which contained the following allegations:

### V-A

Defendant has breached its obligations to plaintiff, which obligations are set forth in Exhibit A, particularly in regard to paragraph (1) on page 4 (referring to taxes), paragraph (6) on page 5, paragraph (8) on page 5, and paragraph (10) on page 6 of said instrument.

Said breaches consist primarily of failing to make the contract payments on time; of failing to pay the real estate taxes on the subject premises on time; of permitting waste on the subject premises; *and of seriously, if not irreparably, jeopardizing the landlord-tenant relationship by breaching the terms of every lease with its tenants in respect to the subject premises.*

(Italics ours.)

This is the first time that respondent specifically alleges that appellant is in default under the contract for permitting waste on the premises. Later in the trial court, as we have previously stated, respondent's counsel stated it was no longer relying upon the delinquency involving the July monthly installment payment under the contract.

Appellant by answer denied each allegation contained in the foregoing amended paragraph of the amended complaint. Subsequently, the trial court on appellant's motion struck the italicized portion thereof.

On September 3, 1968 appellant tendered to respondent a check in the amount of $38,000 for the delinquent real estate taxes paid by respondent corporation. This tender was refused by respondent in a letter sent to appellant's counsel on September 6, 1968. Appellant thereafter deposited the amount necessary to pay the taxes, plus interest

accrued thereon, into the court registry pending its determination of the controversy.

The trial of the case began on November 19, 1968 and continued for 6 days. The testimony of the 17 witnesses called by the parties covered a wide range of subjects and is recorded in 549 pages of the statement of facts. Eighty-two exhibits were admitted into evidence. At the conclusion of the testimony, the trial court rendered an oral opinion in which it stated that appellant was in default in its performance of the contract, but that it should be given a 6-month period of grace in which to "cash out" respondent's net equity. This would require a payment of about $280,000, plus attorney's fees and costs, and the assumption of the underlying mortgage and contracts as provided in the trial court's decree.

■ Appellant has appealed from that judgment and has made 9 assignments of error, of which the first 8 are directed to specific portions of the trial court's findings of fact. In connection therewith, we have diligently and thoroughly reviewed the record of the trial court proceedings. Our review shows that the trial court based its findings of fact on the conflicting evidence before it and that its findings of fact are amply supported by the evidence. We have often held that, even though we might have found the facts differently if we had been the trier of the facts, we will not substitute our judgment for that of the trial court where there is substantial evidence to support its findings. *Sheldon v. Hallis,* 72 Wn.2d 993, 435 P.2d 988 (1967); *Sander v. Wells,* 71 Wn.2d 25, 426 P.2d 481 (1967); *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

In view of the foregoing, we are of the opinion that appellant's first eight assignments of error are without merit.

In its final assignment of error, appellant contends that the trial court erred in not reinstating the real estate contract on condition that appellant cure the defaults within a grace period.

The judgment of the trial court reads in part as follows:

> 1. The rights of defendant, PACIFIC INTERNATIONAL CORPORATION, to purchase the real estate and appurtenances hereinbelow described (commonly known as Juanita Shopping Village) under the terms and conditions of that certain executory real estate contract dated April 30, 1966, recorded in the office of the King County Auditor May 9, 1966 . . . are hereby terminated (subject to a period of grace to purchase plaintiff's equity as set forth in paragraph 6 below) . . .

The effect of the foregoing judgment was to terminate the contract but grant appellant an option to acquire respondent's net equity within 6 months thereafter. Instead of allowing appellant to reinstate its rights under the contract by curing its existing defaults, the trial court sought to protect respondent's substantial interests in the real estate contract, and at the same time grant appellant the right to acquire respondent's net equity with the specified period of grace.

■ It is elementary law in this jurisdiction that forfeitures are not favored and never enforced in equity unless the right thereto is so clear as to permit no denial. *Dill v. Zielke,* 26 Wn.2d 246, 173 P.2d 977 (1946); *Moeller v. Good Hope Farms, Inc.,* 35 Wn.2d 777, 215 P.2d 425 (1950); *State ex rel. Foley v. Superior Court,* 57 Wn.2d 571, 358 P.2d 550 (1961); *Hyrkas v. Knight,* 64 Wn.2d 733, 393 P.2d 943 (1964); *Rocha v. McClure Motors, Inc.,* 64 Wn.2d 942, 395 P.2d 191 (1964).

In *Dill v. Zielke, supra,* we stated the reasons why forfeitures are abhorred and a reinstatement of a contract with a period of grace is favored as follows at 252:

> Recognizing the hardship that often attends a strict enforcement of a forfeiture provision, and confronted with a situation where such enforcement would do violence to the principle of substantial justice between the parties concerned, under the particular facts of a case, the courts of this state have frequently relieved a party from default of payment on an executory contract involving real estate by extending to such person a "period of grace" within which to make such payments.

*See also State ex rel. Foley v. Superior Court, supra,* at 574-75, where we noted the following considerations:

> But we do have in this case the factor which has always appeared most important to the court—a substantial financial loss to the buyer if the contract is forfeited, with no corresponding loss to the seller if a period of grace is allowed.
>
> In this case we do not think that the trial court would have been in error in denying relief to the relator if he had proposed only to bring his payment up to date. His financial condition and prospects were such as to offer little hope that he could make his payments promptly and regularly in the future, and consequently it would have been unjust to the sellers to subject them to the probable necessity of bringing another law suit for future defaults. But there appears no just reason why the relator's tender of an amount sufficient to pay the balance of the contract, plus interest and all expenses incurred by reason of his defaults, should not have been held sufficient to relieve him of the forfeiture.

In that case the trial court denied a period of grace since the relator had no prospects of raising the necessary money to reinstate the subject contract. However, on the day appointed for the signing of findings of fact, conclusions of law, and the judgment, the relator offered to pay the contract balance and it was stipulated that a check had been tendered, but that the offer was rejected because it was too late. We held on appeal that the offer of the relator to pay the contract balance in full would have prevented a forfeiture and would have resulted in no financial loss to the sellers, and that the trial court therefore erred in denying relief to the relator.

In *Foley,* we recognized the general rule that a forfeiture can be avoided by a simple tender of overdue payments bringing the contractual obligations up to date. In fact, this rule is the one favored by this court in such cases. However, in *Foley,* we explicitly recognized, in the foregoing quoted language, our approval of an alternative course of action where such relief would seriously threaten the financial stability of the seller. In other words, more than a simple updating of the contract may be required by

the trial court, and steps may be taken to protect a seller's financial position. In the instant case, the trial court weighed both the positions of the appellant-buyer and the respondent-seller and gave to the appellant a period of grace in which he could pay off the respondent's equity and acquire his interests in the real estate. The trial court rejected appellant's plea that the contract merely be updated and reinstated, and chose instead to balance both parties' interests and reach an equitable and reasonable resolution of the controversy. We think the trial court did not abuse its discretion in adopting this course of action.

The real estate contract executed in 1966 by respondent and appellant carried a purchase price of $899,091. The subject real estate at the time of trial was worth approximately $1,100,000. Respondent had developed the real estate, and in so doing had obtained a mortgage loan from Equitable to finance construction in the principal amount of $500,000 bearing interest at a rate of 5½ per cent. The note executed by respondent provided for monthly installment payments of $4,088. At the time of the execution of the contract, the principal balance unpaid on the mortgage was $462,415.14.

Under the terms of the real estate contract, appellant was required to make monthly installment payments, both on the remaining contract balance and monthly payments to Equitable as required by the mortgage note. The payments were applied as follows: (1) $4,088 on the Equitable mortgage and (2) $2,400 on the contract. When the forfeiture notice was sent to appellant on July 12, 1968, appellant had failed to make either monthly payment due in July, and on July 8, 1968 had been informed by the bank, through which the funds were channeled, that the account contained insufficient funds to meet its obligations. The respondent, at trial, withdrew its claim of default as to the monthly contract payment, as it had accepted tender of the amount for July from appellant.

Additionally, under the contract, appellant agreed to pay all real estate taxes and assessments on the subject premises before delinquency. On the date the forfeiture notice

was sent to appellant, it had not paid the 1967 taxes and no payment had been made on the 1968 taxes. The taxes and interest thereon amounted to approximately $40,000. After the forfeiture notice was sent to appellant, respondent was informed by Equitable that unless the taxes were paid within 30 days the matter would be referred to its counsel for legal action. Respondent then paid the taxes. Appellant tendered into the registry of the trial court the amount of taxes paid by respondent when tender of the amount was refused by respondent in a letter dated September 6, 1968.

Under the terms of the real estate contract appellant had also agreed to keep the buildings and other improvements on the subject premises in good repair. Appellant's failure to perform this obligation was noted in the finding of fact No. 4 to which no error has been assigned on this appeal. We need not detail in this opinion the nonchalant attitude which pervaded appellant's dealings with the tenants of the subject premises. It is obvious from the record of the trial court proceedings that many of the buildings and area surrounding them had fallen into a state of disrepair, and the tenants were unhappy. In finding of fact No. 8, the trial court enumerated numerous examples of appellant's failure to maintain the property and improvements in good repair. The trial court conceded that although none of the specific examples enumerated in the finding constituted a substantial breach of a contractual obligation, the accumulation of the examples of neglect by appellant of the premises did constitute a substantial breach of appellant's contractual duty to maintain the premises in repair.

Mr. Woo, president of appellant corporation, stated that he had advised the tenants to contact him with any difficulties or problems they might have concerning the subject premises. However, the record is replete with evidence showing that Mr. Woo neither could be contacted at the telephone number he gave to the tenants, nor would he respond to written communications to him at appellant corporation's offices requesting maintenance help. The state of disrepair on the premises is best illustrated by evidence produced in the trial court, showing that from the time

respondent took control of the premises in August, 1968 until the time of trial, it had to expend nearly $18,000 in providing needed repairs neglected by appellant.

We would be remiss in our resolution of the controversy if we did not take cognizance of the fact that in September, 1967, at a time when the 1967 taxes were delinquent and appellant was failing to maintain the property and improvements in good repair (finding of fact No. 8), appellant sold certain waterfront property in West Seattle to the city of Seattle. The purchase price received from the city was $109,149.93. Instead of using a portion of these funds to pay the 1967 tax obligation which was then delinquent, and to maintain the premises in good repair, appellant chose to expend the total sum it received from the city for the purchase of another shopping center, known as Westgate, the total cost of which was over $600,000. In addition to this 1967 transaction, appellant in previous years had invested substantial sums in other real property transactions. The record shows that he was not a novice in substantial real estate negotiations. In our view, to allow appellant to speculate in other areas while it neglected its existing contractual obligations to respondent would be both unjust and inequitable to the respondent.

The contract executed by the parties was unambiguous and clear. Our review of the record lends no support to appellant's argument that respondent waived its right to claim a default and forfeiture under the contract. In fact, no assignment of error is even made by appellant to conclusion of law No. 7, in which the trial court concluded that as to the real estate taxes and the issue of maintenance of the premises in good repair, respondent and its officers at no time acted in a manner evidencing a waiver of their rights under the real estate contract.

In view of the amount of money involved in the subject real estate transaction, it seems incredible to us that a man of Mr. Woo's educational background and experience in dealing in extensive property interest would attempt to negotiate a contract of this magnitude without the benefit of legal counsel. Quite possibly some of the pitfalls which

he encountered during the life of this real estate contract could have been avoided if he had employed counsel in 1966 instead of waiting until 1968 when the difficulties under the instant contract arose.

In conclusion, we feel that the equities lie with respondent seller, who had to expend substantial sums of money to make real estate tax payments, repairs, and bring the mortgage payments up to date. In order to protect the underlying mortgage loan contract, respondent was forced to take emergency action to avoid foreclosure by Equitable. In light of appellant's conduct through the life of the contract, it is clear that possible future defaults, if the contract were simply reinstated, could be expected to occur which would seriously endanger the financial stability of respondent. Therefore, it is our determination that the trial court correctly concluded, in accordance with the seller's contention, that an outright reinstatement of the contract, by payment of the past due sums, would be inequitable.

Furthermore, the trial court took into consideration appellant's substantial investment in the subject premises during the life of the contract, and provided a method whereby appellant could refinance the contract and take over the equity of respondent. By this result, the trial court balanced the equities of both parties and reached a just result.

For reasons stated above, we hold that the trial court in rendering its judgment of December 5, 1968 correctly determined the equitable rights of the parties to this action, and its judgment is affirmed. However, if, after the going down of the remittitur, the trial court shall deem it desirable to take further evidence with respect to the accounting set forth in paragraph 6 of the judgment because of changes in amounts of such items occurring since December 5, 1968, the trial court may hear such evidence and change the amounts of such items, and by supplemental judgment, correct the same to reflect the change in such items, if any, since the date of the judgment appealed from.

Since the time for the exercise by appellant of the right granted to it by the trial court's judgment to "cash out"

234

respondent's equity will expire on June 5, 1969, the period within which such right must be exercised is hereby extended for a period of 90 days from the filing of the remittitur in the trial court.

Respondent shall also recover the sum of $2,697 as attorneys' fees for services on this appeal and its taxable costs in this court.

HUNTER, C. J., FINLEY, HAMILTON, and McGOVERN, JJ., concur.