570 P.2d 1334

**Wayne E. ELLIS and J. Evelyn Ellis, husband and wife, Plaintiffs-Appellants,**

v.

**Delwin W. BUTTERFIELD and Clara R. Butterfield, husband and wife, Defendants-Respondents.**

**No. 12086.**

Supreme Court of Idaho.

July 13, 1977.

Rehearing Denied Dec. 1, 1977.

John C. Hepworth, of Hepworth, Nungester, Felton & Hart, Buhl, for plaintiffs-appellants.

Daniel A. Slavin, of Stephan & Slavin, Twin Falls, for defendants-respondents.

BAKES, Justice.

This appeal presents questions concerning the relative rights and interests of a vendor and a defaulting purchaser under an installment land sale contract. Wayne E. and J. Evelyn Ellis, the purchasers, appeal from a judgment of the district court, Twin Falls County, declaring their contract terminated and allowing the vendors, Delwin and Clara Butterfield, to retain all payments made under the contract, and awarding the vendors $1,500.00 attorney fees. Ellises contend that the trial court should have ordered the vendors to accept their tender of the balance owing on the contract. We affirm, except as to the award of attorney fees.

On September 18, 1967, Ellises and Butterfields entered into a land sale contract wherein Ellises would purchase from Butterfields certain commercial property in Buhl. The purchase price was $17,232.00, bearing interest at 7% with payments of $125.00 per month for the first year and $209.00 per month thereafter. The purchasers agreed to pay all property taxes accruing thereafter, to procure a fire insurance policy on the premises, and to deposit a life insurance policy in escrow naming Butterfields as beneficiary. The contract recites that time is of the essence and in the event of the purchasers' default, the vendors had the option to:

"(a) Declare this agreement terminated and upon the making of such declaration all of the rights of the Buyers to continue said purchase or to continue in possession of said premises shall immediately terminate and Sellers shall retain all money paid to them as purchase price as liquidated damages; or

"(b) Declare all installments of purchase price, which installments include interest, due hereunder to be immediately due and payable, provided, however, that before the termination of this agreement or before the declaration of all installments of purchase price, which installments include interest immediately due and payable, the Sellers must give Buyers thirty (30) days written notice of their intention to terminate this agreement or to declare all installments of purchase price immediately due and payable and said written notice shall contain the grounds upon which such action is based and if within such thirty day period the Buyers shall fully comply with and conform with the provisions hereof for the breach of which the Sellers shall give notice, then and in that event this agreement shall remain and be in full force and effect the same as if such default by Buyers had never been made; . . ."

The contract also provided that if either of the parties engaged the services of an attorney to enforce their rights under the contract, the attorney fees of the prevailing party would be paid by the other party.

Ellises made payments on the contract, although they were frequently delinquent. Butterfields sent Ellises letters in May, 1972, and October, 1972, advising them that they were in default of payments. In addition, the purchasers had not paid the property taxes for the years 1970–1974, and the vendors had received notices in 1969 and in 1970 that the fire insurance on the property had been cancelled.

In the fall of 1973, Ellises again became delinquent on their payments and on December 17, 1973 Butterfields sent a thirty day notice of intent to terminate the agreement for failure to pay the installments when due. The Ellises did not cure their default within thirty days, and by letter dated January 21, 1974, Butterfields' attorney demanded of the escrow bank a return of the escrow papers based upon the proof of service of Butterfields' letter of December 17, 1973. On January 23, 1974, Ellises tendered a cashier's check for $657.00 (presumably the amount in default) to the escrowholder. However, the vendors refused to accept this tender and on January 29, 1974, Ellises were served with a letter from Butterfields demanding that they quit the premises because the contract was terminated. Ellises then negotiated for a loan of the entire contract balance, which was tendered to the vendors along with approximate attorney fees on March 12, 1974. But-

terfields rejected this tender also, and Ellises brought this suit seeking to compel Butterfields to accept the balance due on the contract and to deliver a warranty deed to them. Butterfields counterclaimed for termination of the Ellises' rights under the contract according to the contract provisions, restitution of possession and attorney fees.

By stipulation of the parties, the matter was submitted to the district court on the basis of uncontradicted facts in the pleadings, some testimony, and numerous exhibits. In its findings of fact and conclusions of law, the trial court found that the thirty day period following Butterfields' demand letter had expired on January 17, 1974, and therefore the sellers were not obligated to accept the buyers' tender of the amount in default on January 23, 1974. The court noted that the vendors had paid the taxes on the property for the years 1971 and 1972, and the property taxes for 1973 and 1974 remained unpaid, and also that the vendors had an unsatisfied judgment against the Ellises for attorney fees incurred in previous attempts to enforce the contract against them.

The court concluded that it would not be inequitable or unreasonable to allow the vendors to retain all amounts paid by the purchasers, declared the contract terminated, and awarded sellers restitution of possession and $1,500.00 attorney fees and costs. The Ellises have appealed.[1]

The appellants assign as error the ruling of the trial court declaring the contract forfeited and its refusal to compel the vendors to accept their tender of the amounts owing on the contract, as well as their subsequent tender of the balance of the contract. They also assign as error the award of attorney fees to the vendors, and the trial court's denial of their motion for a new trial.

An installment land sale contract is one of three security devices generally used in credit transactions in real estate and is, in essence, a hybrid composed of property law concepts on the one hand and contract law on the other. While the transaction involves the transfer of ownership of real property, it is governed by the terms of a contract in which vendor and purchaser join. The vendor generally, but not invariably, deposits a deed in escrow, but title does not pass to the purchaser until all installments are paid in accordance with the contract. The contract is frequently called a "poor man's mortgage" because the vendor, as with a mortgage, finances the purchaser's acquisition of the property by accepting installment payments on the purchase price over a period of years, but the purchaser does not receive the benefit of those remedial statutes protecting the rights of mortgagors. *See* I.C. §§ 6–101 *et seq.* The land secures the purchaser's performance because in the event of his default, the vendor ordinarily retains the right to terminate the transaction and retake the property. The advantage to the purchaser is that he does not have to procure the expensive (and sometimes unavailable) institutional financing; the advantage to the vendor is the theoretically simple procedure of terminating the purchaser's interest in the event of default as contrasted with the expensive and time consuming mortgage foreclosure action, with its right of redemption. Comment, Forfeiture: The Anomaly of the Land Sale Contract, 41 Albany L.Rev. 71, 74–76 (1977).

When the purchaser under a land sale contract defaults in his payments, such contracts usually provide that the vendor can terminate either the contract or the purchaser's interest in it, and the purchaser forfeits his payments and all of his rights in the land. If the purchaser is several years into the contract, this remedy may be unduly harsh. But when the purchaser is in default, what is his interest and what are his rights under the defaulted contract? The parties to the transaction chose the contract as the vehicle by which the transfer of the property would be governed. If they had used a conventional mortgage, the mortgagee would have had to bring statuto-

---

1. The Ellises' counsel on appeal did not try the case before the district court.

ry foreclosure proceedings against the defaulting mortgagor, I.C. § 6–101 *et seq.* and the mortgagor would have had six months after the judicial sale (if the property is 20 acres or less) in which to redeem, I.C. §§ 6–101, 11–402. Further, the mortgagee would only be entitled to recover the amount due on the mortgage from the proceeds of the judicial sale, although as a practical matter the mortgagee ordinarily bids the property in at the judicial sale for the amount of the balance owing on the debt, and the mortgagor then has the redemption period in which to redeem and protect any "equity" which he may have.

The parties to a sale of land might also have availed themselves of the statutory deed of trust to secure their respective rights. *See* I.C. § 45–1502 *et seq.* Under the Trust Deeds statute, the property is conveyed to a trustee for the benefit of the vendor and in the event of the purchaser's default the trustee can conduct an extra-judicial sale of the property and satisfy the debt. Under this procedure, the defaulting purchaser is given 115 days from the date of the filing of the notice of default within which to cure his default, I.C. § 45–1506. A trustee's sale is final, and the purchaser has no right to redeem from the person who purchased the property at the trustee's sale. *Roos v. Belcher,* 79 Idaho 473, 321 P.2d 210 (1958).

In this case, the Ellises and the Butterfields did not avail themselves of either the mortgage or deed of trust security devices. Nevertheless, Ellises contend that they should be given protection analogous to a mortgagor, and that the court should allow them to redeem the property from Butterfields. They allege that they have made improvements on the property worth approximately $5,000.00, and in addition, they have made payments totaling approximate-

ly $15,000.00 ($8,124.00 principal) on the contract to date. They use these figures to buttress their argument—that a forfeiture of the contract in this case would be inequitable. However, at no time in these proceedings have they argued that the foregoing amounts are disproportionate to the damages sustained by Butterfields or that the vendors are unjustly enriched by retention of payments and recovery of the property. The trial court specifically found otherwise, and this ruling is not challenged on appeal. Thus, Ellises do not seek restitution of amounts paid on the theory that the liquidated damages were exorbitant and a penalty, *see e. g. Graves v. Cupic,* 75 Idaho 451, 272 P.2d 1020 (1954), but they seek to retain the property.[2]

The issues in this case are very similar to those presented in *Howard v. Bar Bell Land & Cattle Co.,* 81 Idaho 189, 340 P.2d 103 (1959). The purchaser's interest in the land sale contact in that case had been assigned a number of times, and the vendors sought cancellation of the contract based upon the defaults of the purchasers. After the vendor began cancellation and quiet title proceedings, the last assignee tendered payment of the balance due on the contract and asked the court to require the vendors to accept their tender. At trial, the vendors attempted to prove that their damages exceeded the payments made under the contract, but the trial court rejected this proof and instead granted the forfeiture giving the purchasers sixty days to redeem the property (this amount was deposited into court by the purchasers). The vendors appealed.

This Court observed first that the action invoked the equity jurisdiction of the court and quoted the rule articulated by the Court in *Graves v. Cupic, supra,* that where

---

2. This case is also distinguishable from those in which the Court has refused to grant the vendor a forfeiture because the vendor is himself in default: *Fajen v. Powlus,* 98 Idaho 246, 561 P.2d 388 (1977); *Blinzler v. Andrews,* 94 Idaho 215, 485 P.2d 957 (1971); *Dohrman v. Tomlinson,* 88 Idaho 313, 399 P.2d 255 (1965); *Associated Developers Co. v. Infanger,* 85 Idaho 158, 376 P.2d 496 (1962); *Huggins v. Green Top*

*Dairy Farms,* 75 Idaho 436, 273 P.2d 399 (1954); or because the vendor has effectively waived the vendee's defaults: *Heisel v. Cunningham,* 94 Idaho 461, 491 P.2d 178 (1971); *Stockmen's Supply Co. v. Jenne,* 72 Idaho 57, 237 P.2d 613 (1951); *Stringer v. Swanstrum,* 66 Idaho 752, 168 P.2d 826 (1946); *Sullivan v. Burcaw,* 35 Idaho 755, 208 P. 841 (1922); *Haas v. Coburn,* 22 Idaho 47, 124 P. 476 (1912).

the forfeiture or damage fixed by a contract is arbitrary and bears no relation to the actual damages, it is regarded as a penalty and is void and unenforceable. The Court then stated:

"It is the lawful privilege of the parties to a contract for the sale of real property to make time of performance of the essence of their agreement. It is also their privilege to agree in advance upon the damages to be recompensed in case of breach. The courts, both at law and in equity, must respect the provisions of a contract lawfully agreed to. [Citations omitted]. But, where the facts make the damage agreed to an unconscionable penalty, equity will intercede to grant relief. *Graves v. Cupic,* supra." 81 Idaho at 197, 340 P.2d at 107.

The Court then noted:

"On the trial the defendants [purchasers] offered no evidence to show that the damages provided by their contract did not bear a reasonable relation to plaintiffs' [vendors] actual damages, or that they were exorbitant and unconscionable. In seeking relief from the forfeiture the burden of proving such facts rested upon defendants. [Citations omitted]." 81 Idaho at 197, 340 P.2d at 107.

The Court then held that the trial court erred in granting the purchasers a right of redemption without first considering whether the damages stipulated in the contract amounted to an unconscionable penalty or whether they bore a reasonable relation to the actual damages sustained. The Court stated:

"This is an issue which must be determined in favor of the purchasers as a condition precedent to their asserted right to relief from the forfeiture. The order and judgment of the court granting the defendants the right to redeem was,

therefore, premature and unsupported by a finding that the damages provided by the contract were in fact a penalty." 81 Idaho at 198, 340 P.2d at 107.

The Court further held that in order to obtain relief from forfeiture of the property, the purchasers must prove not only that the stipulated damages amounted to a penalty but, in addition, that restitutionary relief would be inadequate. 81 Idaho at 198. The Court observed that the judgment of the trial court in effect granted the defaulting purchasers specific performance of the contract which they had breached. The Court noted that it was the vendors who were entitled to equitable relief, not the vendees, stating:

"Being without fault and having strictly performed the contract on their part, and having accorded to defendants more than the grace period contracted for, plaintiffs are entitled to the benefit of the forfeiture provision, except to the extent that it might constitute a penalty. They may not be compelled to perform specifically in favor of the parties who have breached the contract, when such parties can be adequately protected by way of restitution. *Hall v. Yaryan,* 25 Idaho 470, 138 P. 339; *Hinsch v. Mothorn,* 44 Idaho 539, 258 P. 540" 81 Idaho at 198, 340 P.2d at 108.

The *Howard* case is the only prior case in this jurisdiction in which a defaulting purchaser asserted a right to relief from a forfeiture of the property under a land sale contract rather than recovery of a portion of the payments. As we have noted, this Court did not preclude the possibility of giving the purchasers the right to redeem, but only if the purchasers could demonstrate both that the stipulated damages amounted to a penalty and also that a restitutionary remedy was inadequate.[3] How-

---

3. Judicial sale of property may be appropriate relief where, for instance, the purchaser had made substantial improvements on the property prior to his default. In such a case, the purchaser would show (1) that it would be an unconscionable penalty to allow the vendor to recover the improved property and also retain all payments made, *see Graves v. Cupic, supra;* and in addition (2) that the vendor would still be unjustly enriched by recovering the improved property even if the purchaser was allowed restitution of amounts paid on the contract. The solution of judicial sale would probably be preferable to both parties in such a situation because the vendor could recover the amount of the debt rather than the property

ever, the Court held that in the absence of a finding that the forfeiture constituted an unconscionable penalty, the contractual forfeiture and the vendor's right to terminate the defaulting purchaser's interest and retain the payments made were proper remedies for the vendor.

Ellises rely on this Court's opinion in *Walker v. Nunnenkamp,* 84 Idaho 485, 373 P.2d 559 (1962). In *Walker,* the defaulting purchasers appealed from a judgment which rejected their claim for recission of the contract and granted to the vendors forfeiture of the contract. This Court held that the purchasers could be entitled to restitution of some of the amounts paid under the rule of *Graves v. Cupic, supra.* It remanded the case for further proceeding on the issue of damages. The respondent-vendors sought a rehearing on the ground that the action was for strict foreclosure of the contract, under which remedy restitution of amounts paid would not be available to the purchaser. After an extended discussion of the remedy of strict foreclosure, the Court further held:

> "Since this case is not governed by statute, but is one that is controlled entirely by equitable principles, the [trial] court in its wisdom may deem it proper and equitable to direct a judicial sale of the property involved." 84 Idaho at 499, 373 P.2d at 568.

It is important to note that the context of this statement of the Court was with reference to the vendor's protest at the prospect of a judgment in favor of the purchaser for restitution of a portion of the amounts paid on the contract. It may well be the case that a vendor seeking to terminate a contract because the purchaser is in default would prefer not to recover the land and perhaps have to make restitution of payments to the purchaser and would therefore prefer the remedy of the judicial sale in

terminating the purchaser's rights. This holding was not inconsistent with the holdings of the Court in *Walsh v. Coghlan,* 33 Idaho 115, 190 P. 252 (1920), and *Mochel v. Cleveland,* 51 Idaho 468, 5 P.2d 549 (1930), that a vendor under a land sale contract can elect between the contractual remedy of forfeiture and repossession and the statutory remedy of foreclosure and sale. However, we do not read *Walker v. Nunnenkamp, supra,* as giving the *defaulting purchaser* a right to have the contract terminated by way of judicial sale, nor do we read the *Walker* decision as otherwise affecting the holding of this Court in *Howard v. Bar Bell Land & Cattle Co., supra.*

We conclude therefore that these defaulting purchasers had no right to specific performance of the contract after the thirty day period had run and the vendors had terminated the contract, nor did they have an equitable right of redemption.[4] The rights of these parties were defined by the contract, *Howard v. Bar Bell Land & Cattle Co., supra.* In the absence of a determination that the amounts paid by the purchaser and retained by the vendor constituted a penalty, the purchasers were not entitled to relief from the remedy provision of their contract.[5]

The appellants assign as error the failure of the trial court to grant their motion for a new trial. In an affidavit attached to his motion for a new trial, Wayne Ellis alleged that his mother died on the morning of the day set for trial and thus he was unable to appear. If he had been able to appear and testify, Ellis alleged that he would have testified that Butterfields represented to him that they would waive the purchaser's default. However, the record of the proceedings before the trial court indicates that the attorney

heavily encumbered with the purchaser's improvement liens.

**4.** "[CONCLUSION OF LAW] IX. That the Agreement provided that time was of the essence and no evidence exists for excusing Plaintiffs for the breach of their Agreement." Clk. Tr., p. 32.

**5.** "[CONCLUSION OF LAW] X. That based upon the evidence before the Court, retention of all Monies paid by the Plaintiffs to the Defendants as liquidated damages is neither inequitable nor unreasonable." Clk. Tr., p. 32.

for the Ellises, who was present at trial, did not request a delay, nor did he in any way indicate to the court the reasons why Wayne Ellis could not appear or what the substance of his testimony would have been. Most of the evidence was stipulated to by the parties. Under the circumstances, the trial court did not abuse its discretion in denying the motion. I.R.C.P. 59, *Isaguirre v. Echevarria,* 96 Idaho 641, 534 P.2d 471 (1975).

■ Appellant Ellises have objected to the award of attorney fees to respondents, and have themselves moved in this Court for attorney fees on appeal. Their objection to the award of attorney fees is well taken. Respondents' defense to Ellises' effort to compel them to accept the tender was based upon their claim that after the thirty day notice of default was given they terminated the contract. Having terminated the contract, they cannot later assert the attorney fee clause [6] in it while defending successfully against appellants' action to reinstate the contract. By parity of reasoning, appellants' motion for attorney fees is likewise denied.

The judgment is affirmed. Costs to respondents.

McFADDEN, C. J., and DONALDSON, J., concur.

SHEPARD, J., concurs in result.

BISTLINE, Justice, dissenting.

The majority opinion works an injustice to the appellants and is at such a variance with the prior decisions of this Court, that I must respectfully dissent. The importance of this case can not be overemphasized; the majority opinion today takes this Court a giant step backwards.

## I.  LAND SALE CONTRACTS.

The land sale contract continues to play an important role in financing Idaho real estate property transactions. It brings together purchasers and sellers where otherwise a transaction might not be brought to culmination. Both are benefited. It is of extreme importance to the person desiring to sell on a time agreement. In our apparently never-ending upward inflationary spiral, together with appreciating real property values, an installment contract is the primary vehicle whereby a seller can divest himself of his property, and, by keeping the down payment to anything below 30% of the agreed purchase price, avoid income taxes which would be confiscatory were he to take the cash which his buyers would raise by an institution mortgage. Further, the buyer pays interest at a greater rate than the ordinary seller might expect to obtain on the investment markets open to him.

It provides, as the majority notes, a means of financing for purchasers (buyers, vendees) who might not qualify for institution mortgages or who cannot accumulate the sums needed for a transaction with a down payment and the balance financed on a trust deed. For the vendor (seller) a title-retaining contract provides a remedy which is *theoretically* less expensive and more expeditious than the statutory foreclosure proceeding which must be employed in the case of mortgages and trust deeds. The theoretical advantage evaporates if the purchaser is in possession and refuses to vacate. In this circumstance the vendor must resort to the courts, either in ejectment or, in some states, for forcible entry and unlawful detainer. In addition, the vendor will probably be advised to bring a quiet title action so as to gain a title which precludes future challenges by a dispossessed purchaser. In the present case, where the parties are awaiting a summer of 1977 resolution of a controversy arising out of a fall of 1973 default, the theoretical "advantages" are nil, or less. It is many the contract vendor in this state who has learned, the hard and expensive way, that the advantages to his being placed in a contractual posture rather than on a trust

---

**6.** "In the event either party hereto shall engage the services of an attorney to enforce any of their rights under this agreement the prevailing party shall be paid by the other party as attorney fees a reasonable sum."

deed or purchase money mortgage posture, become a nightmarish litigation luxury which he would just as soon not experience. By a mechanical application of the *Graves v. Cupic* theory, the courts have placed a non-defaulting vendor, a vendor who has sold his property and didn't want it back, in the position of being given it back, with a lien against it in favor of the vendee, or the vendee's assignee, which lien may be a rather significant amount, and one which the guiltless vendor may be hard-pressed to raise in the usual 30 days allotted him, and with a very good probability of being forced into an undesirable second sale.

The land sale contract, in its traditional and unmodified form, is a one-sided agreement. The injustices to the purchaser are many. In the first place, the promises of purchaser and vendor are not mutually dependent. The purchaser must make his periodic payments regardless of the vendor's probable ability to produce a marketable title at the end of the contract or such delayed time as the contract provides. The land sale contract purchaser has none of the remedies provided by the U.C.C. in cases where "reasonable grounds for insecurity arise." U.C.C. § 2–609. *But see* the strongly worded persuasive dissent of Justice Shepard in *Blinzler v. Andrews,* 94 Idaho 215, 485 P.2d 957 (1971), arguing against the unreasonableness of insisting upon continued performance by the purchaser under such circumstances.

Second, the land sale contract vendor, unlike the mortgagee, can insist upon a forfeiture once his purchaser is in default (even if the default is due to the conduct of the vendor). The vendor can bring an action in ejectment without accounting for the excess of payments and improvements made by the purchaser over the actual damages incurred by the vendor. If the purchaser is uninformed, the vendor may end up keeping all the back payments *and* repossessing the land simply because the purchaser, unlike the mortgagor, has no statutory right to a reasonable time within which to redeem his equity. *See,* Lee, "The Interests Created by the Installment Land Contract," 19 U. of Miami L.Rev. 367 (1965).

Third, if the installment land sale contract is not recorded (as it frequently is not, recording sometimes being prohibited by the very language of the contract), the vendor can sell and convey valid title to a bona fide purchaser, leaving the contract vendee to pursue an action for damages against the vendor (if he is still around), rather than having the remedies available to an actual property owner. *See,* Idaho Real Estate Practice, § 5.33 (1977).

Fourth, since the purchaser's interest in the property is often held to be merely that of a lien holder, it follows that his interest may be cut off by a federal tax lien or even by a judgment executed in favor of the seller's creditors. *See,* Randolph, The Installment Land Contract as a Junior Lien Security, 54 Mich.L.Rev. 929 (1956).

Fifth, a trustee in bankruptcy can cancel the contract because it is said to be merely "executory" at all times prior to payment of the final installment. *See,* Lacy, "Land Sale Contracts in Bankruptcy," 21 U.C.L.A. L.Rev. 477 (1974).

Sixth, since the land sale contract is not categorized as the forbearance or loan of money, it may follow that the usury laws of the various states may not be held applicable to prevent the seller from charging unconscionable interest rates. *See,* Comment, "Forfeiture: The Anomaly of the Land Sale Contract," 41 Albany L.Rev. 71 (1977).

Seventh, the risk of loss to the property is held to rest upon the purchaser throughout the duration of the contract even though his "equitable title" grants him none of the other rights of an owner, but only the right to insist upon specific performance by the vendor upon completion of all installment payments. *See,* Comment, *supra.*

Finally, in the event of a title default by the seller, the purchaser's recovery is limited to a return of his installments. His lien is said to attach to the property only for the installments paid; it does not include other expenses such as title search costs, attorney fees or even the cost of improvements he may have made while in possession of the property. *See,* Comment, *supra.*

Given this long list of horrendous probabilities, why would any purchaser in his right mind ever enter into an installment land contract? Why would any attorney ever counsel such conduct by a purchaser? Aside from the fact that the purchaser is often not advised of or offered any other choice, the obvious reason is that courts of equity have traditionally been protective of the defenseless purchaser. It is this tradition that the majority today renounces in the name of safeguarding the continued viability of land sale contracts in Idaho. I fear exactly the opposite will be the result. The history of other jurisdictions shows that the surest way to destroy land sale contracts as a viable financing tool in real property transactions is to give full literal force to the arsenal of remedies such contracts invariably grant to the vendor. *See,* Lohn, Toward Abolishing Installment Land Sale Contracts, 36 Montana L.Rev. 110 (1975); Powell, Reforming the Vendor's Remedies for Breach of Installment Land Sale Contracts, 47 So.Calif.L.Rev. 191 (1974).

## II. TRADITIONAL EQUITABLE PROTECTION

Courts of equity have evolved many safeguards against a one-sided enforcement of land sale contracts and, paradoxically, have thereby maintained the usefulness of the instrument itself down to the present day. For one thing, the court will insist that the contract contain *explicit* time-of-the-essence and forfeiture clauses. A contract containing such clauses will not be held to be self-executing; the court will insist that the vendor give notice of his intent to terminate the contract. A vendor who pursues inconsistent remedies (such as *both* forfeiture and foreclosure) may be told that he has thereby rescinded the contract and must refund all back payments to the purchaser. A vendor with a pattern of past acceptances of delinquent payments may be held to have waived strict compliance of a purchaser's payments. And a vendor who misleads the purchaser by way of conduct inconsistent with a forfeiture may not then forthwith enforce a strict forfeiture. *See,*

Lee, Remedies for Breach of the Installment Land Contract, 19 U. of Miami L.Rev. 550 (1965); Spencer, Remedies Available under a Land Sale Contract, 3 Willamette L.J. 164 (1964).

A court of equity should easily find that the present case fits within at least two of the exceptions to forfeitures which are mentioned above. In the first place, a pattern of late acceptances is generally held by a court of equity to constitute waiver of default unless subsequent notices make it clear that no such waiver is intended for the future:

"Where a contract for sale of real estate makes time of the essence, and provides for a forfeiture of the vendee's rights for failure on his part to make payments at certain times, a continued course of conduct on the part of the vendor in failing to declare a forfeiture, thereby leading the vendee to believe that the vendor waives a strict compliance with the terms of the contract, works a waiver of the vendor's right to declare a forfeiture, unless and until he gives the vendee reasonable notice of his intention to do so, and a reasonable opportunity to make the delinquent payments." *Sullivan v. Burcaw,* 35 Idaho 755, 763, 208 P. 841, 843 (1922). *See also, Singleton v. Foster,* 98 Idaho 149, 559 P.2d 765, 768 (1977) (Bistline, J., concurring).

In the present case, the escrow ledger reveals that 27 out of the 67 payments made under the contract were accepted late. What is more, on the two preceding occasions on which 30-day notices were sent out, payments were then accepted after the 30 days had expired. A notice of termination was sent to the Ellises on June 14, 1973, and partial payments were accepted thereafter on June 15 and August 1, 1973. Another notice of termination was sent out on August 2, 1973, and the account was not brought current until September 4, 1973. Thus, the December 17, 1973, notice of termination would hardly have warned the Ellises that a tender of back payments on January 23, 1974, (6 days after the expiration date) would be rejected. On such facts, the tender should be held timely.

Secondly, Idaho courts have also insisted upon equitable treatment for the purchaser when he is misled by the post-default conduct of the vendor. In this case, Wayne Ellis was unable to come and testify at the trial because of the death of his mother on that very day. By affidavit, however, he established the evidence his testimony would have supplied:

"After being served with the thirty (30) day default notice by Del Butterfield, defendant, your affiant, Wayne E. Ellis, spoke with said defendant over the telephone and asked if he would consider a payment of $8,500 as final settlement of the real estate contract. Defendant, Mr. Butterfield, said he would consider such an offer and authorized your affiant to go to a local bank and determine if he could obtain a loan in this amount."

Ellis' first attempt failed. Shortly thereafter, however, he succeeded in getting a loan from First Federal Savings & Loan Association in the amount of $12,500. According to the affidavit,

". . . it was not until this time that your affiants first learned that the defendant intended to refuse any such tender of the balance of the contract price and other charges which had accrued."

The Ellis' complaint likewise states that "during the months of February and March repeated tenders, both oral and in writing, were made to the defendants by the plaintiffs of the entire contract balance and attorney's fees." *This allegation was explicitly admitted by the Butterfields* in their counter-claim.

Under such circumstances, this Court should hold that the post-default conduct of the Butterfields makes a forfeiture inequitable. In *King v. Seebeck*, 20 Idaho 223, 118 P. 292 (1911), this Court long ago insisted that,

" '. . . the party claiming the benefit of a forfeiture must show himself to be strictly within the terms of the instrument which confers that right. He must act promptly in asserting his claim and *his acts* relating thereto *must be positive,*

*unequivocal, and inconsistent with the continuance of the contract.* . . . When the defendant informed the plaintiff that he was unable to pay, and wanted more time, stating that he thought he could possibly raise the money . . . the plaintiff, if then determined to insist upon the forfeiture, ought to have said so in positive and unequivocal terms. He ought to have informed the defendant that he need not make any effort to raise the money as the time had passed, and the money would not be received on Saturday if tendered. On the contrary, he carefully refrained from giving express consent to further time, but in his own mind did consent . . . .. He permitted the defendant to engage in another effort to raise the money in the belief that if secured the plaintiff would accept it. This attempt to hold on to the forfeiture and waive it does not show such candor and fairness as the circumstances demanded. He ought to be held to this waiver.' " *King v. Seebeck*, 20 Idaho at 233–234, 118 P. at 295, quoting from *Cue v. Johnson*, 73 Kan. 558, 85 P. 598 (1906). (Emphasis added.)

The contract before us provides the vendors with an election of remedies in the event of default by the purchasers. Under clause 8(a), as quoted in the majority opinion, *supra*, the Butterfields had the right to terminate the contract and retain all back payments as liquidated damages. It is this remedy the Butterfields elected in sending their December 17, 1973 notice of termination. Clause 8(b) is a standard acceleration clause whereby the Butterfields might elect to declare all remaining payments immediately due and payable. It cannot be pursued jointly with the clause (a); the vendor must elect between them. Thus, if Butterfield in any way condoned Ellis' efforts to raise the full purchase price money, he evidenced a willingness to be satisfied with a remedy inconsistent with the one announced in his letter. It should also be noted that the contract does not provide for liquidated damages if the vendor chooses to pursue his remedy under the acceleration clause. Further, that clause has a *separate*

30-day notice requirement and clearly none was given under it. On a new trial these matters would be given proper consideration. At the very least, the record before us warrants a reversal of the trial court's denial of the motion for reconsideration and for a new trial.

### III. EQUITY AND "TIME OF ESSENCE" CLAUSES.

The majority opinion agrees that in a case such as this where "the purchaser is several years into the contract," the remedy of forfeiture may be "unduly harsh." Nevertheless, according to the majority, the Court's hands are tied because the parties stipulated that "time is of the essence" and the purchaser was 6 days late in tendering back payments and nearly two months late in tendering the full purchase price plus costs, including attorney fees. The hands of a court of equity are never tied.

It is a truism that while parties to a land sale contract may stipulate that time be of the essence, the fact remains that

"Just because the parties have declared that time shall be of the essence does not necessarily make it so. The parties cannot by use of labels convert an apple into an orange. It is the business of courts to look through form to substance." *Rothenberg v. Follman*, 19 Mich.App. 383, 172 N.W.2d 845, 850 (1969).

More than a century ago, the Michigan court dared to probe beneath the surface of the magic formula, "Time is of the essence." As with all magic, the formula did not fare well in the light of day.

"Time is always of the essence of a contract when an act is required to be done within a specified time; as much so as the act itself, and no more. Every part of a contract is of its essence. It is not very clear what courts and text-writers who use this phrase mean." *Richmond v. Robinson*, 12 Mich. 193, 200 (1864).

The *Rothenberg* court suggested that the phrase "time is of the essence" was nothing more than a euphemism for the proposition that "no court of equity shall have any power to relieve against such forfeiture." *Rothenberg v. Follman, supra*, 172 N.W.2d

at 850, fn. 14. This suggestion—which appears to be the meaning given to the phrase both by the trial court and the majority opinion in this case—had, however, been soundly rejected a century earlier:

"[The phrase cannot mean that equity will], by any stipulation of the parties, be ousted of its jurisdiction, or refuse to relieve against the exaction of the pound of flesh, although the parties have, in express terms, stipulated for it." *Richmond v. Robinson, supra*, 12 Mich. at 200.

Or, as the concurring opinion in that same case made clear:

"Time can not be made essential in a contract, merely by so declaring, if it would be unconscionable to allow it. Parties may stipulate to make it so, where the stipulation is reasonable; but, as in stipulated damages, if the stipulation is not reasonable, courts will not regard it." *Ibid.*, at 202.

The *Rothenberg* court went so far as to take judicial notice of the fact that the phrase was mere boiler plate; that it *could* not be rigidly enforced in cases where the purchaser was in peaceable possession; that it was used indiscriminately regardless of whether the contract intended possession by the purchaser or not; and that the phrase was little understood by laymen and by many in the profession alike. Above all, the court concluded:

"We have no reason to believe that the original seller and purchasers in this case intended that in the event the contract was forfeited the purchasers would have no opportunity whatsoever to redeem, that the court of equity had thereby been ousted of all power in the matter." *Rothenberg v. Follman*, 172 N.W.2d at 850, fn. 14.

In *Rothenberg*, the defaulting purchasers sought to have the forfeiture set aside and to have the contract specifically performed in their behalf. The contract had been forfeited on October 1, 1965, and in December—some 2 months after the date of forfeiture and 7 months after the date the installment was due—the purchasers had offered to pay not only the delinquent installment but also the entire balance owing

on the contract. In granting specific performance to the purchasers, the Michigan court listed the factors which a court of equity should consider in dealing with such cases. I commend them to my brethren:

". . . the delay in making the payment was relatively short, the amount in default was relatively small, the amount of the forfeiture was large both quantitatively and in relation to the balance owing and that the purchasers acted in good faith in offering to pay the entire balance owing. They might have acted more diligently, but the delay in offering to pay and in commencing this action does not, considering the other factors just mentioned, preclude granting relief." 172 N.W.2d at 849.

Nor is Michigan the only jurisdiction holding that a court of equity must do equity regardless of a "time essence" clause. The Supreme Court of Nevada has also granted specific performance to a defaulting purchaser in the face of a land contract with time essence and forfeiture clauses:

"The fact that the contract of purchase and sale made time of the essence is not controlling. That provision coupled with a provision for forfeiture does not preclude equitable relief from a default and declaration of forfeiture if performance is later tendered without unreasonable delay *and no circumstances have intervened to make it inequitable to give such relief.*" *Slobe v. Kirby Stone, Inc.*, 84 Nev. 700, 447 P.2d 491, 492 (1968). (Emphasis added.)

That such intervening circumstances are unlikely to occur in *real estate transactions* was well understood by this Court in *Stringer v. Swanstrum*, 66 Idaho 752, 168 P.2d 826 (1946), where, in another context, we remarked that such a transaction typically does not

". . . concern property of a fluctuating or uncertain value. On the contrary, it involved property of a real and permanent character (realty), concerning

which lapse of a brief time could make very little difference to either the vendor or the purchaser by the delay of a few days in the matter of the performance of a contract of purchase." 66 Idaho at 759, 168 P.2d at 829.

If such be true in the case of an option to purchase, where the default of one purchaser may well cost the seller the loss of another potential sale, it is all the more true when a party in possession for nearly six years is six days late in bringing a delinquent account up to date.

Finally, in Iowa, a vendor is, *by statute*, obliged to give the land sale contract purchaser a 30-day notice of forfeiture before declaring the contract forfeited. A vendor there proceeded to give the 30-day notice to her defaulting daughter-in-law who was over $3,000 in arrears. Though the statute had been complied with, the Supreme Court of Iowa still refused to be stripped of its equitable powers and asked:

"Under the circumstances above related, is the 30-day notice of forfeiture under § 656.2 alone sufficient to forfeit [the purchaser's] interest in the contract? Or, to put it another way, did such notice afford [the purchaser] *a reasonable opportunity to pay the installments due and owing . . .?*" *Bettis v. Bettis*, 228 N.W.2d 193 (Iowa 1975). (Emphasis added.)

The court concluded that 30 days was an inadequate time within which to expect a defaulting purchaser to raise $3,000 when, until recently, the vendor had waived delay in payments. We should here hold, in like manner, that 30 days is an unrealistic amount of time within which to expect the Ellises to raise the $8,500 (or whatever amount was required) which the Butterfields indicated they might be willing to accept in full payment for the property, and, likewise, that 6 days' tardiness in bringing a land sale contract up to date is not so material a breach of that contract as to warrant its forfeiture.[1]

1. One need hardly turn to *equity* to reach such a result:

"Simple contract law has always distinguished between a material breach and an

## IV. THE RIGHT OF A DEFAULTING PURCHASER TO SPECIFIC ENFORCEMENT OF THE CONTRACT HE HAS BREACHED.

My views are not to be taken as resting upon mere technicality. As boiler plate hardens with age, and as counsel become ever more adept at avoiding pitfalls for the vendor, the ultimate question must eventually be reached: Does a defaulting purchaser who has built up sizeable equity in a land sale contract have a right to specific performance of the very contract he has breached? That is to say, can he, after being unable to meet a 30-day notice of forfeiture, then tender the back payments within a reasonable time and thereby save the contract? Alternatively, can his tender of the entire purchase price, albeit slightly belated, yet entitle him to a deed?

### A. The Majority's Exclusive Focus on Liquidated Damages.

The majority says that he cannot. Reliance is placed upon *Howard v. Bar Bell Land & Cattle Co., supra,* which, we are told, is "the only prior case in this jurisdiction in which a defaulting purchaser asserted a right to relief from a forfeiture of the property under a land sale contract rather than recovery of a portion of the payments." The *Howard* case is said to bar the relief sought by the Ellises for two reasons. One is that it is "the vendors who [are] entitled to equitable relief, not the vendees," since the vendors are "without fault" and have "strictly performed the contract on their part." Thus the vendors "may not be compelled to perform specifically in favor of the parties who have breached the contract." This appears to be a kind of "dirty hands" approach to the problem: a court of equity will not grant specific performance of a contract to the purchaser who has sullied himself by being unable to make scheduled payments.

The majority's second *Howard* premise is a corollary of the first. Since a court of equity has no choice but to enforce the land sale contract (with "time of essence" and forfeiture clauses) against the defaulting purchaser, the sole relief it may grant is restitution to the purchaser of an amount by which his payments and improvements exceed "actual damages." Unfortunately, says the majority, the Ellises pleaded only a right to redeem their equity rather than for restitution of excess back payments:

> "However, at no time in these proceedings have they argued that [their payments and improvements] are disproportionate to the damages sustained by Butterfields or that the vendors are unjustly enriched by retention of payments and recovery of the property. The trial court specifically found otherwise, and this ruling is not challenged on appeal."

It follows, says the majority, that the Butterfields are to be granted the back payments, the improvements *and* the property while the Ellises are out of court, and just plain out. I say "non sequitur."

For the Court that gave Idaho, and all jurisprudence, *Graves v. Cupic* and *Walker v. Nunnenkamp* to now engage in such logic-chopping is nothing short of scandalous. Article 5, § 1 of our Idaho Constitution, and I.C. § 5–101 did abolish any distinction between law and equity, but it did not abolish equity. This case, as the trial court Note of Issue states, "is plaintiffs' action *in equity* to forestall forfeiture on an agreement of sale covering real property." Equity once invoked subsumes all issues:

> "[E]quity having obtained jurisdiction of subject matter of a dispute, will retain it for the settlement of all controversies between the parties with respect thereto and *will grant all proper relief whether prayed for or not.*" *Boesiger v. Freer,* 85

immaterial breach. A man may breach his contract but that does not necessarily void the contract or excuse performance by the other. If the breach is immaterial, the contract is still enforceable although subject to damages. In the present case we are dealing

with a breach in the form of delayed payments of two installments. Interest is ordinarily an adequate measure of damages for the failure to pay money when due." *Blenheim Homes, Inc. v. Mathews,* 119 Ohio App. 44, 196 N.E.2d 612, 614 (1963).

Idaho 551, 563, 381 P.2d 802 (1962). (Emphasis added.)

I am at a loss, therefore, to explain the majority's strange conclusion that equity grants relief when liquidated damages are excessive, but not when the entire contract is unconscionable; that it can look behind the words "liquidated damages" and find them to be an inequitable "penalty" but that it may not similarly inspect "time of essence" and "forfeiture" clauses; that a defaulting purchaser can get the ear of equity when he pleads for restitution, but not when he cries out even more loudly for the right to redeem his equity.

To begin with, let us get the record straight. If, as the majority asserts, the Ellises have "at no time in these proceedings" argued that their payments are disproportionate to the damages sustained by the Butterfields or that the Butterfields are unjustly enriched thereby, one would have to wonder how and why "the trial court specifically found otherwise." The answer, of course, is that the majority assertion is simply *not* correct. On the contrary, the original complaint in this case avers that "a forfeiture of the contract and retention of all payments made by plaintiffs to the defendants would be inequitable and unconscionable." Under notice pleadings this alone would suffice to raise the *Graves v. Cupic* doctrine. Further, the case is before us as an appeal from the refusal of the trial court to grant Ellis' motion for a new trial. That motion included an affidavit of Wayne Ellis which set forth the basic arithmetic of this case, as starkly as possible, and asked relief from the "inequitable" results of enforcing the forfeiture.

What I find woefully missing in the majority opinion is any appreciation for the commercial realities involved in this transaction. If the purchasers are to be granted the relief they seek (identical to the relief vendors would have had had they exercised their option to accelerate rather than their option to forfeit), the following would result: Purchasers, who are well into the sixth year of a ten-year contract and who have paid vendors $15,000 ($8,000 in princi-

pal and $7,000 in interest) and have also made improvements valued at $5,000, by tendering the outstanding $9,000 plus costs, redeem their equity and come into possession of property now appraised at $22,000. The vendors, under this scenario, get precisely what they initially wanted, namely, $24,000 (the time value of their financing of a $17,000 piece of property), plus costs for their inconvenience.

If, however, the vendors are allowed to forfeit the purchasers' rights, then, in exchange for six years' possession of the property, the vendors come away with $37,000, namely, the $15,000 in payments *plus* the property which by reason of purchasers' improvements or market trends, has appreciated to $22,000. Under such a state of affairs, the Ellises have made out a *prima facie* case that "the foregoing amounts are disproportionate to the damages sustained by Butterfields" and "that the vendors are unjustly enriched by retention of payments *and* recovery of the property." A court of equity can not blind itself to the obvious. Nor should a suit brought in equity reach such vastly different results simply because it is brought under different labels.

That a *prima face* case of inequity *is* made out under these circumstances is granted by the majority when it states that "if the purchaser is several years into the contract, this remedy may be unduly harsh." The same conclusion has been reached by everyone who has ever thought clearly about the matter.

> "The anomaly of forfeiture is that the more the purchaser pays, the less the seller's need for security, yet the greater the impact of forfeiture." Comment, Forfeiture: The Anomaly of the Land Sale Contract, 41 Albany L.Rev. at 102.

Or, as another commentator put it:

> "Certainly where the contract equates liquidated damage with installments paid and thus increases the forfeiture in inverse proportion to the actual damage suffered, such a provision is a penalty and not a legitimate liquidated damage clause." Lee, Remedies for Breach of the Installment Land Contract, 19 U. of Miami L.Rev. at 552.

Or, as the Colorado Court of Appeals held with regard to the enforceability of a liquidated damage clause such as that now before us:

" . . . the amount stated as liquidated damages must be reasonable and proportionate to the presumed injury. . .

"However, the provision under consideration here provides that all payments made by the buyer, regardless of whether they constitute one percent or ninety-nine percent of the total purchase price, must be forfeited by the buyer in the event of any default of payment or breach of any of the covenants. . . . we hold that the liquidated damages provision demonstrates, by its own terms, that its enforcement under many circumstances may result in an unconscionable forfeiture. *Therefore, the liquidated damages provision is void and unenforceable.*" *Oldis v. Grosse-Rhode*, 35 Colo.App. 46, 528 P.2d 944, 947 (1974). (Emphasis added.)

Surely, the same understanding of basic commercial facts was manifest in *Walker v. Nunnenkamp* where this Court cast Idaho's lot with those jurisdictions that no longer allow a vendor to bring an action in "strict foreclosure" because such an action "would result in a decree cutting off any and all interest of the vendee in the land." 84 Idaho at 496, 373 P.2d at 566. The unfairness of utilizing the approach today adopted by the majority opinion was by this Court as then constituted clearly understood:

"Any unfairness which will develop will be to the vendee by reason of the fact that prior to default he has paid a considerable portion of the purchase price or that the property has so enhanced in value that without a sale he will be unable to realize the profit to which his ownership would appear to entitle him." 84 Idaho at 497, 373 P.2d at 566.

The Court in *Walker v. Nunnenkamp* envisioned a procedure whereby the trial court would grant a defaulting purchaser a reasonable time within which to redeem his equity:

"In normal times the danger of loss of the vendee's profit from increased value of the land is not great, in that he will be able to refinance his undertaking before the time of payment limited by the decree has expired." *Ibid.*

Even this procedure, however, was one the Court feared could result in inequitable results:

" . . . in times of economic depression, when refinancing is difficult or impossible, a grievous loss in this respect is very possible along with whatever he had paid on the purchase price, this latter being increasingly worse the later the depression catches up with him; perhaps after he has paid a major number of the installments, or erected substantial improvements, or heavily invested in the property in both particulars." 84 Idaho at 498, 373 P.2d at 567.

I would hold, therefore, that when, as here, purchasers are more than half-way through a land sale contract; or when, as here, they have paid off more than 45% of the principal of the contract; or when, as here, the property has substantially appreciated due either to market trends or to the purchaser's own improvements, a *prima facie* case has been made out that the liquidated damages provision of the land sale contract amounts to a penalty. Such would constitute one of the "proper cases" referred to in *Walker v. Nunnenkamp* where we said:

"This Court in actions involving land sale contracts has, in proper cases, required *the vendors* to make affirmative proof of damages to forestall injustice to vendees." 84 Idaho at 498, 373 P.2d at 567. (Emphasis added.)

The majority opinion to the contrary notwithstanding, *Howard* though it predates *Walker v. Nunnenkamp*, does not stand for any other result. In the *Howard* case, we did not put the purchaser out of court because he had presented no evidence regarding the excessiveness of his back payments as liquidated damages. *We remanded to find out whether or not the liquidated damages provision constituted a penalty.* Indeed, it has never been the practice of this

Court to "foreclose the vendee's interest without a sale or consideration of his equitable rights." *Walker v. Nunnenkamp*, 84 Idaho at 497, 373 P.2d at 566. A court of equity cannot issue decrees on the mere hope that they will not turn out to be inequitable.' Whenever the court has been unable to determine the equities based upon the record before it, a remand has been ordered. In addition to *Walker v. Nunnenkamp, supra*, and *Howard v. Bar Bell Land & Cattle Co., supra*, and *Graves v. Cupic, supra, see also, Valdez v. Christensen*, 89 Idaho 285, 404 P.2d 343 (1965); *Melton v. Amar*, 83 Idaho 99, 358 P.2d 855 (1961).

I conclude that even on its own narrow issue of liquidated damages, the majority is in error.[2] I would hold on this issue that the order of the trial court denying the Ellises a new trial should be reversed and the case remanded to determine whether and to what extent the enforcement of a forfeiture under these conditions would exact a penalty to the purchasers because of excessive back payments and an unjust enrichment to the vendors because of the improvements allegedly made by the purchasers.

### B. *The Defaulting Purchaser's Right to Specific Performance*

The above, it seems to me, is the upshot of this Court's decisions in land sale contracts in the twenty-three years which have elapsed since *Graves v. Cupic*. That case involved the sale of a tavern to a woman recently widowed. No sooner had the contract been completed and the $14,000 down payment been accepted than the widow discovered that, as a new resident of Idaho, she was not eligible to receive a beer and liquor retail license. She sued, therefore, to cancel the contract. This Court, reversing the trial court, held that despite a contract clause providing that her payments were to be forfeited as "liquidated damages," they bore no reasonable relation to the sellers' actual damages and that she deserved restitution of all but the rental value of her 4 months' occupancy.

The mistake of the majority opinion is in viewing the *Graves v. Cupic* situation of an *early* default as the *sole* situation in which a purchaser deserves equitable relief, and the mechanical formula decreed in that case (restitution of the purchaser's payments to the extent they exceed the seller's damages) as the *sole* remedy available to a court of equity. My own reading of *Graves v. Cupic* is rather that it provides one way of making the threshold determination as to whether or not a forfeiture would be inequitable. Once that determination is made—and I have already indicated that it should be made under the facts of the present case—a court of equity should feel free to fashion an appropriate remedy on a case by case basis. It stands to reason that a simple forfeiture would be proper when an insolvent purchaser with virtually no equity in the property absconds early on in the contract. Inexpensive and speedy repossession by a vendor under such circumstances is precisely the virtue of the installment sale land contract. The same remedy, though provided for in the contract, was deemed inappropriate for the widow who had a substantial equity in *Graves v. Cupic* ; thus the Court decreed restitution of her excess payments.

The question in the present case is the appropriate remedy to be fashioned by a court of equity when a purchaser who is more than half way through an installment contract but who has a history of delinquent payments is once again six days late in tendering an installment. Specifically, can the defaulting purchaser on tender of the full purchase price then obtain specific

---

2. The extent to which the majority's conclusion will shock the Idaho Bar can be seen from the pleadings in this case. The Ellises alleged, in Paragraph XII of their complaint, that their offers "were repeatedly rejected and defendants [Butterfields] reiterated their position that they intended to forfeit the contract and to retain the entire payment made by the plaintiffs." The Butterfields hastened to answer that as vendors they had no such greedy overreaching designs and that they "continually advised Plaintiffs that an offset would have to be made between Plaintiffs and Defendants for Plaintiffs' equity, in accordance with the principles established by the Idaho case of *Walker v. Nunnenkamp*."

performance of the very contract that he has just recently breached? Virtually every court in the United States which has been faced with this question has answered it in the affirmative. *See*, Annot., Specific Performance of Land Contract Notwithstanding Failure of Vendee to Make Required Payments on Time, 55 A.L.R.3d 10 (1974). The majority replies, to the contrary, that a party who has breached a contract cannot himself ask equity to enforce that contract against the innocent vendor.

The majority's analysis misses the point as to when equity is called upon to intervene and which equities it is to consider. If equity cannot intervene on behalf of a purchaser because he has defaulted, then equity can *never* intervene because every forfeiture case, unless it is spuriously brought, will *always* involve a defaulting purchaser. The equities which are to be weighed are generally those in the post-default situation. It is the rare purchaser who will be "fortunate" enough to be able to explain his pre-forfeiture conduct to a court of equity as appealingly as did the Montana purchaser who argued that he entered into the contract without knowing what he was doing, because of

"  .   .   . a series of incidents occurring over a period of time prior to September 8, 1949, namely: he saw his first wife burn to death; he had a mental breakdown which put him in a Denver hospital for six weeks; he was struck by lightning; an 8,000 gallon tank of gas hit him and smashed his combine; he lost 25 head of cattle in a big storm; and got hailed out." *Lewis v. Peterson,* 127 Mont. 474, 267 P.2d 127, 129 (1954).

More typically, the purchaser, as here, will be guilty of a pattern of conduct involving delinquent tax payments, lapsed insurance policies and missed installment payments. Nonetheless, it is the *post-default* equities which the court must weigh. As the Supreme Court of Washington said in a situation with far less to recommend it than does the present one:

"Such considerations [improvements of the property by the buyer, plus prompt tender of delinquent payments prior to trial] which have been found to constitute equities in favor of the buyer, are absent here. But we do have in this case *the fact which has always appeared most important to the court—a substantial financial loss to the buyer if the contract is forfeited, with no corresponding loss to the seller if a period of grace is allowed.*" *State v. Superior Court for King County,* 57 Wash.2d 571, 358 P.2d 550, 552 (1961).

The majority opinion never once considers this paramount question of equity. It poses but never quite answers the question: "But when the purchaser is in default, what is his interest and what are his rights under the defaulted contract?" It misstates the issue by claiming that "Ellises contend that they should be given protection analogous to a *mortgagor.*" And it concludes, with no supporting analysis, that by definition the purchaser under a land sale contract "does not receive the benefit of those remedial statutes protecting the rights of mortgagors."

Courts which have considered the issue, have almost uniformly decided that land sale contract purchasers *do* deserve protection akin to that provided in the remedial statutes protecting the rights of mortgagors. In *Walker v. Nunnenkamp,* this Court quoted approvingly from an A.L.R. annotation which, as early as 1932, summarized existing case law as standing for the proposition that,

"  .   .   . for all practical purposes the relation of vendor and vendee under an executory contract for the sale of land is that of mortgagor and mortgagee. The vendee is the beneficial owner, with the right of redemption notwithstanding default of payment; while the claim of the vendor is but an ordinary money debt, secured by the contract." Annot., 77 A.L.R. 270, 272 (1932).

It would follow that a defaulting vendee, like a defaulting mortgagor, should be given a grace period within which to bring his payments up to date or within which he may tender full payment on the remaining purchase price and thereby redeem his equi-

ty. Other jurisdictions which explicitly grant the defaulting land sale contract purchaser protections analogous to that of the mortgagor and which allow him the specific enforcement of his contract by providing a grace period within which to redeem his equity, include: California: *MacFadden v. Walker,* 5 Cal.3d 809, 97 Cal.Rptr. 537, 488 P.2d 1353 (1971); *Freedman v. Rector,* 37 Cal.2d 16, 230 P.2d 629 (1951). Florida: *H & L Land Company v. Warner,* 258 So.2d 293 (Fla.App., 1972). Montana (by statute): *Parrott v. Heller,* 557 P.2d 819 (Mont.1976). Ohio: *Blenheim Homes, Inc. v. Mathews,* 119 Ohio App. 44, 196 N.E.2d 612 (1963). Vermont: *Strengowski v. Gomes,* 268 A.2d 749 (Vt.1970).

The majority to the contrary notwithstanding, the *Howard* case is not the sole case in this jurisdiction wherein a defaulting purchaser sought specific performance from his vendor under a land sale contract. In *Haas v. Coburn,* 22 Idaho 47, 124 P. 476 (1912), a forgetful purchaser was late in his payments and his vendor refused to accept the payment when tendered because, as here, the vendor

> "contended that time was of the essence of the contract and that the failure of the respondent to make payment at the time and in the manner specified in the contract worked a forfeiture of all rights under the contract." 22 Idaho at 49, 124 P. at 477.

Justice Ailshie rejected the contention as inherently inequitable and outside the obvious intent of the parties because,

> " . . . it is not reasonable to suppose that he [the purchaser] would have been inclined to forfeit all the improvements that he had made on the premises. . . . " 22 Idaho at 51, 124 P.at 478.

Forfeiture was refused and specific performance granted on behalf of the purchaser because of the paramount equitable consideration that,

> "During the time that was allowed to elapse between the actual maturity of the indebtedness and the tender of payment, the appellant [vendor] did not change his relation to the property nor was he in any

way prejudiced by reason of any changed relation he thereafter sustained either to the property or to the respondent or any third party." 22 Idaho at 51, 124 P. at 478.

In *Sullivan v. Burcaw,* 35 Idaho 755, 208 P. 841 (1922), a vendor sought a forfeiture and a purchaser cross-complained seeking specific performance. The cross-complaint was denied because the purchasers "did not tender the total amount due and were not entitled to a specific performance of the contract." 35 Idaho at 764, 208 P. at 844. Forfeiture, however, was also denied and the vendor remitted "to another remedy, more ,equitable under the circumstances, viz., a proceeding to foreclose the equity" of the purchaser. *Ibid.*

Similarly, in *Hagan v. Clyde,* 60 Idaho 785, 97 P.2d 400 (1939), a vendor attempted to forfeit a purchaser's rights under a land sale contract. This Court assumed that the trial court's decree of strict foreclosure was beyond its power, but held it to be mere harmless surplusage because the trial court

> " . . . in the exercise of sound legal discretion could, as it did, fix such time as appeared to it under all the facts and circumstances of the case to be just and equitable, within which appellants [purchasers] might pay respondents [vendors] the balance found to be due them. . . In the exercise of such discretion the court gave appellants nearly seven months in which to pay the balance adjudged to be due respondents. The time so given was ample; therefore, appellants were in no way prejudiced." 60 Idaho at 791, 97 P.2d at 402.

I am convinced, moreover, that the district judges of Idaho generally read this state's case law as granting a defaulting purchaser a grace period within which to redeem his equity. In the case of *Gem State Industrial Corp. v. Reynolds,* for example, Judge Prather granted the.defaulting purchaser 30 days within which to pay off the balance of his purchase price because,

> " . . . in the case of *Walker v. Nunnenkamp,* 84 Idaho 485 [373 P.2d 559], the

Idaho Supreme Court declared that in the interest of equity and justice in cases such as this the Court could grant a delinquent purchaser a reasonable amount of time within which to pay the sum due under the contract." Kootenai County, Case No. 26088 (1972).

Similarly, in the case of *Shillito v. Shull,* Judge Cogswell granted the defaulting purchaser 60 days from the entry of judgment within which to pay the entire purchase due on the contract, plus interest, costs and back taxes and insurance which had been paid by the vendor. He relied upon *Walker v. Nunnenkamp* for the proposition that such a decree would generally be granted " . . . [by] the courts of this and other states where a contract for the sale of realty is executory on both sides and the vendee has failed to make the payments required under the contract, the vendor, in case such relief is not inequitable, is entitled to a decree fixing a reasonable time in which the vendee will be required to pay the purchase price, and upon his failure to pay such price within the time limited, the vendee, without judicial sale, will be barred and foreclosed of his equitable estate in said property, whereupon the contract will be cancelled and the vendee's rights thereunder will be terminated." Bonner County, Case No. 12070, quoting from *Walker v. Nunnenkamp,* 84 Idaho at 499, 373 P.2d at 567.

In summary, my familiarity with the law as practiced in the district courts of Idaho, and my reading of the case law of Idaho and that of other jurisdictions, convinces me that equity should allow a defaulting purchaser a grace period within which to redeem his equity. In addition to the jurisdictions already cited, those which would also reach the conclusion I advocate here include: Alaska: *Williams v. DeLay,* 395 P.2d 839 (Alaska 1964); *Land Development, Inc. v. Padgett,* 369 P.2d 888 (Alaska 1962). Colorado: *Ulander v. Allen,* 544 P.2d 1001 (Colo.App.1976); *Oldis v. Grosse-Rhode,* 35 Colo.App. 46, 528 P.2d 944 (1974). Indiana: *Tidd v. Stauffer,* 308 N.E.2d 415 (Ind.App.

1974). Nebraska: *Riffey v. Schulke,* 193 Neb. 317, 227 N.W.2d 4 (1975). Washington: *Suess v. Heale,* 68 Wash.2d 962, 416 P.2d 458 (1966); *State v. Superior Court for King County, supra.* Wisconsin: *Coraci v. Noack,* 61 Wis.2d 183, 212 N.W.2d 164 (1973).

I would reverse the ruling of the trial court in this case and would remand with instructions to determine the amount still owing on the purchase price, along with interest, and costs due to the vendor in the form of back taxes he has paid and attorney's fees he has incurred in these proceedings. The trial court should then set a reasonable time within which the purchaser would be required to tender these amounts. If he fails to meet the payments, the contract should be canceled and all his rights thereunder should be terminated. If he makes the payments, the contract should be specifically enforced and the vendor should be compelled to convey warranty deed to the property.

## V. CONCLUSION.

A word should be said to tidy up several outstanding questions. First, it will be noted that I stop short of advocating that Idaho align itself with those jurisdictions which grant defaulting purchasers under a land sale contract the full protection granted mortgagors. If the land sale contract is to remain viable in Idaho, we must not go so far. The inexpensive and speedy remedy of forfeiture is still entirely appropriate when the contract is in its earliest stages; when the purchaser has made virtually no down payment or improvements; when the purchaser abandons the property; or when the vendor is himself forced to take over possession in order to pay taxes, insurance, and see to it that the property is kept up properly. *Tidd v. Stauffer, supra.*

I would also decline to set up a mechanical formula (though the legislature might wish to do so) specifying the turning point at which a buyer's rights are elevated to those of a mortgagor. One commentator has suggested that the transitional percentage should be 5% of the purchase price.

Powell, Reforming Vendor's Remedies, *supra.* Still another commentator would set up a rebuttable presumption that when the buyer's payments surpass 15% of the selling price, it would be presumed that his investment equals or exceeds the vendor's damages. Comment, Forfeiture: The Anomaly of the Land Sale Contract, *supra.* Surely, there is no question that in the present case, where the buyer's payments exceed 85% of the purchase price and his equity exceeds 45% of the purchase price, he should be given the protection routinely accorded a mortgagor in the form of a reasonable amount of time within which to redeem his equity.

For the rest, I would prefer to retain a measure of flexibility for case by case determination in a court of equity. The factors to be considered would include: the size of the down payment and the amount of payments as a percentage of the selling price; whether the purchaser is in possession or has abandoned the property; whether the purchaser has made improvements or has permitted the property to deteriorate; whether the property has appreciated or depreciated in value as a result of market trends; whether refinancing is easily available or, in an era of depression, is difficult to come by. When all these factors have been weighed, the court of equity must be free to fashion a remedy appropriate to the particular case.

Finally, there is the question of equity to *the vendor.* Throughout this opinion, I have argued for equity to the purchaser. The vendor needs to be protected from a purchaser who consistently makes late payments, who destroys the property, who lets taxes and fire insurance lapse and who is responsible for other similar out-of-pocket expenses to the vendor. Obviously, mere payment of delinquent installments would only consign the vendor to the same old treadmill. Here I would follow the Supreme Court of Washington which, in the case of a "first offense" (or when equity so requires), grants the purchaser a reasonable time within which to bring his account up to date, but which insists upon full payment when the former remedy "would seriously threaten the financial stability of the sellers" i. e., when the purchaser's past pattern of conduct or his present insolvency would indicate that the deal must be "cashed out" and brought to a conclusion. *See, Will Rogers Farm Agency, Inc. v. Stafford,* 4 Wash. App. 500, 482 P.2d 336 (1971); *John R. Hansen, Inc. v. Pacific International Corp.,* 76 Wash.2d 220, 455 P.2d 946 (1969).

I would also grant the vendor the relief here denied him by the majority. Clearly, he deserves attorney's fees for proceedings brought to protect his rights which have been jeopardized by a defaulting purchaser. This Court has always awarded attorney's fees under clauses such as that present in this contract unless, as here, the vendor's liquidated damages were quite a bit in excess of his actual damages. *Dolbeer v. Harten,* 91 Idaho 141, 417 P.2d 407 (1966); *Valdez v. Christensen,* 89 Idaho 285, 404 P.2d 343 (1965); *Walker v. Nunnenkamp,* 88 Idaho 222, 398 P.2d 444 (1965); *Anderson v. Michel,* 88 Idaho 228, 398 P.2d 228 (1965).