677 P.2d 512

Edward T. WOODGER and Jana L. Woodger, husband and wife; and Woodger Development, Inc., a corporation, Plaintiffs-Respondents, Cross-Appellants,

v.

AMR CORPORATION, an Idaho Corporation, Defendant-Appellant, Cross-Respondent.

No. 14154.

Court of Appeals of Idaho.

Feb. 29, 1984.

J. Kent Jolley, Rexburg, for defendant-appellant, cross-respondent.

Curt R. Thomsen, of Holden, Kidwell, Hahn & Crapo, Idaho Falls, for plaintiffs-respondents, cross-appellants.

WALTERS, Chief Judge.

AMR Corporation appeals from a judgment of the district court awarding Edward and Jana Woodger and Woodger Development, Inc., (herein Woodger) almost $13,-000, pursuant to a liquidated damages provision of their real estate sale contract. Woodger cross-appeals, challenging the district court's denial of rescission of his purchase of a subdivision lot from AMR Corporation. We affirm.

### I. Facts

The following facts in this case are not in dispute. In June 1978, Woodger and Bruce Lind, president of AMR, negotiated a contract for the sale of lots located in Panorama Hills Subdivision and owned by AMR. This contract covered two lots which were owned entirely by AMR and a third lot which AMR owned in part, for a total sale price of $30,000. Woodger also entered into a contract to purchase the remainder of this third lot from its owner, Brent Peterson, for $10,000. Woodger made down payments on both contracts. He executed a note in the amount of $22,000 to pay the balance of the purchase from AMR. To arrange construction financing, Woodger replaced that note with three other notes. Two of the notes later were paid off. Woodger also executed another note in the amount of $8000 to Peterson. That note was to be paid no later than December 9, 1978.

At the time Woodger purchased these lots, neither water nor power had been provided to any of them. Lind testified that AMR and Peterson were responsible for providing water and power to their respective lots. Prior to the sale Lind was aware that the district health department had indicated that it would not issue new sewage permits for new construction in Panorama Hills until problems in the subdivision's water system were corrected. Lind testified that he fully informed Woodger, during the contract negotiations, of problems concerning the water system existing in Panorama Hills. He further testified that AMR promised to provide water to Woodger's lot lines within a reasonable amount of time. Woodger testified that Lind had never advised him that the state had approved the water system, but that Lind had told him that "it wouldn't be too long" before water would be supplied. The contracts which Woodger entered into

with AMR and Peterson provided that each agreement was "subject to [Woodger] obtaining a building permit, water and power to be furnished to lot lines."

When Woodger applied for sewer permits for all three lots, the district health department denied his application. Following negotiations between Lind, Woodger and a district health department official, the department issued sewer permits for two lots. Woodger applied for and received building permits for those two lots. However, both building permits provided that occupancy of the completed houses would not be permitted until the water system for Panorama Hills had been approved.

Woodger began construction in August 1978 on the first two lots. In December 1978, the note payable to Peterson on the third lot became due. Because water had not been supplied to the lot, and the sale was subject to Peterson supplying water to the lot, Woodger told Peterson and Lind that he would not pay the balance of the note. To induce Woodger to pay the note, Lind agreed that AMR would take responsibility for supplying water "to the lot lines of those properties purchased by Ted Woodger at Panorama Hills by no later than March 1, 1979." Lind further agreed that AMR would "pay a penalty of $45.00 per day each and every day thereafter that said water has not been delivered to the lot lines." This written agreement was executed December 15, 1978, the same date that Woodger paid the note to Peterson in full.

AMR did not deliver water to the lot lines by March 1, 1979. Woodger later sued to collect the liquidated damages provided by the December 15, 1978 agreement for the period from March 1, 1979 through April 1, 1980, in the amount of $17,820, and to collect sums accruing after that date. He requested rescission of the sale and return of payments made on the third lot, Lot 3, Block 8, on which he had not begun building. He also asked for attorney fees.

AMR had taken a note in payment of Lot 3, Block 8. It counterclaimed for the balance due on the note, $11,000, interest on that balance, and for attorney fees. It also asked that the court declare the liquidated damages agreement void and unenforceable.

Following trial to the court without a jury, the court found that the liquidated damages agreement was valid and did not impose an unconscionable penalty. The court found that water lines were installed to the lot lines by September 14, 1979 and that, after installing a temporary water storage tank which was made functional in November 1979, AMR "had substantially complied with the requirement to furnish water" as of November 1979. The court further awarded liquidated damages to Woodger for the period from March 1, 1979 to November 15, 1979. The court also found that Woodger's purchase of property was not by virtue of a divisible contract, so he could not rescind the portion of the contract relating to Lot 3, Block 8. It awarded AMR the balance due on AMR's note. The court declined to award costs and attorney fees to either party. This appeal and cross-appeal followed.

## II. Liquidated Damages Provision

AMR argues that the trial court erred in finding the liquidated damages agreement was valid. AMR attacks this finding by contending that Woodger presented insufficient evidence to show a reasonable relationship between the amount stipulated as damages in the agreement and the actual damages he suffered.

However, we do not understand the burden of proof concerning the reasonableness of a liquidated damages provision to be the same as AMR contends. It was not incumbent upon Woodger to show the reasonableness of the relationship between the stipulated damages and his actual damages. Rather, the burden was upon AMR to show the *unreasonableness* of that relationship. Provisions in a contract for liquidated damages in the event of a default are prima facie valid. *In re Grodnik's, Inc.*, 128 F.Supp. 941 (D.Minn.1955). The burden of proving facts to show that damages

provided for by such a contract do not bear a reasonable relation to the actual damages suffered or that they are exorbitant and unreasonable rests upon the party seeking to invalidate the liquidated damages provision. *See Howard v. Bar Bell Land & Cattle Co.,* 81 Idaho 189, 340 P.2d 103 (1959). *Accord Ellis v. Butterfield,* 98 Idaho 644, 570 P.2d 1334 (1977); *Dolbeer v. Harten,* 91 Idaho 141, 417 P.2d 407 (1966); *Anderson v. Michel,* 88 Idaho 228, 398 P.2d 228 (1965); *Nichols v. Knowles,* 87 Idaho 550, 394 P.2d 630 (1964). *See also W.L. Scott, Inc. v. Madras Aerotech, Inc.,* 103 Idaho 736, 747, 653 P.2d 791, 802 (1982) (Bakes, C.J., concurring in part and dissenting in part).

■ Whether, under the facts of a particular case, the amount stipulated as damages bears a reasonable relation to the damages actually sustained so as to be enforceable as a provision for liquidated damages, or whether under the facts the amount stipulated is arbitrary and bears no reasonable relation to the anticipated damages and is so exorbitant and unconscionable as to be regarded as a penalty, is for the trial court to determine. The trial court's finding in this regard, if supported by substantial, competent though conflicting evidence, will be upheld on appeal. *Nichols v. Knowles, supra.*

Here, in finding that the liquidated damages provision was valid, the trial court considered the testimony of both parties concerning negotiation of the liquidated amount. He noted that Woodger had testified they discussed extra interest costs along with other cost factors. He noted that Mr. Lind, on behalf of AMR, recalled discussing only the interest aspect of the possible losses which might flow from delay in getting water to the lot lines. The court determined that "[f]or the parties to sit down and specifically negotiate an amount, reviewing the loss factors in arriving at the amount, it seems unlikely that they would negotiate an unconscionable amount." The court then concluded the negotiated amount did not constitute an unconscionable penalty.

■ The record supports the court's observation that both Woodger and Lind testified the $45 per day figure was calculated in reference to interest which would accrue on Woodger's construction financing. Additionally, Woodger testified that the figure was also computed with reference to items such as delays in construction, resulting in delayed certification as to occupancy and affecting potential sales. He also testified that the figure was computed with reference to additional unknown construction costs which would result from lack of water and power. We hold that substantial competent evidence supports the court's finding that the negotiated liquidated damages did not constitute an unconscionable penalty. This finding will not be disturbed.

### III.   Rescission of the Contract

■ Woodger contends, on his cross-appeal, that the trial court's decision to deny rescission is not supported by the record. He contends the court erred in finding that the contract for the purchase of the three lots was not divisible and in finding that AMR had substantially complied with its obligation to furnish water.

In respect to the divisibility issue, the evidence showed that a single agreement was signed by the parties for the purchase of the three lots. That contract stated a total price covering all of the property purchased and did not allocate the price to individual lots. Woodger eventually executed individual notes and deeds of trust for each lot. However, testimony was presented by AMR that these notes and trust deeds were to accommodate Woodger in obtaining construction financing. The evidence also showed that the parties later entered into the additional agreement relating to liquidated damages in the event AMR was unable to timely provide water to the lots. Again this was a single agreement, which did not allocate the liquidated damages to the particular lots, but continued to treat the entire transaction as a whole.

Whether the agreement to purchase the lots constituted an entire or a divisible contract was a question of fact, to be determined from the structure of the contract combined with evidence of the intentions of the parties. *Vance v. Connell,* 96 Idaho 417, 529 P.2d 1289 (1974). The court here found that the contract was not divisible. That determination is based upon substantial competent evidence. It will not be disturbed.

Finally, the trial court found that AMR had "substantially complied" with the requirement to supply water, by November 1979. The court particularly found that water lines to the lots had been installed by September 14, 1979. The court found that a temporary, functional 7000 gallon water tank had been installed by November 1979. These findings are supported by the evidence. The evidence further shows that Woodger did not serve notice of rescission on AMR until after November 1979. Accepting the trial court's finding of substantial compliance, it appears that AMR was not in default at the time Woodger attempted to rescind the contract. We hold the court did not err in denying rescission to Woodger.

The judgment appealed from is affirmed. No costs or attorney fees on appeal.

BURNETT and SWANSTROM, JJ., concur.