726 P.2d 1135

Scott F. CARTER and Lou Jean S. Carter, husband and wife, Plaintiffs-Appellants,

v.

Wayne R. RICH and Gene M. Rich, husband and wife; Jeffrey Scott Rich, a single man; and Sherwin O. Kirby, d/b/a Mountain Valley Realty, Defendants-Respondents.

No. 16019.

Supreme Court of Idaho.

Sept. 25, 1986.

Rehearing Denied Oct. 29, 1986.

Richard K. Smith, Burley, for plaintiffs-appellants.

Thomas H. Church, Burley, for defendants-respondents Rich, et al.

Roger D. Ling, Rupert, for defendant-respondent Kirby.

SHEPARD, Justice.

This is an appeal from a judgment entered in favor of the defendants following trial of an action in which plaintiffs-purchasers alleged misrepresentation and fraud in the sale of farm lands. We affirm.

The action arose from a real estate installment purchase contract executed in 1979 between plaintiffs-appellants Carters as purchasers, and defendants-appellants Riches as sellers. Defendant-respondent Kirby was the real estate agent employed by the Riches. The property consisted of 600 acres of irrigated land in Cassia County, Idaho, and 300 acres of dry mountain range in Box Elder County, Utah. Prior to the sale, Jeffrey Rich had been farming the Cassia County land as irrigated crop land. In early 1980 the Carters entered into possession of the property and retained possession until April 13, 1983, except ten acres thereof in which the Carters retained possession until the date of the trial court's findings of fact and conclusions of law, February 1, 1985.

The contract provided for a purchase price of $820,000.00, with yearly payments of $66,150.00 which amount was to be applied only to interest until February 28, 1986, following which the yearly payments would also apply on the principal. The contract provided that the Carters would make a down payment of $80,000.00. The Carters sold their dairy herd but only received $75,000.00. Therefore, the Carters agreed to pay an additional $10,000.00 on April 15, 1980, at which point they paid an additional $5,000.00, but never paid the final $5,000.00. In February 1981 the Carters made the first interest payment of $66,150.00, which was the last payment made under the contract. Following the 1981 payment the Carters attempted to borrow money to enter into a dairy operation on the property, but were unsuccessful. Since no additional payments had been made, the Riches gave the Carters a notice of default in March of 1982, requiring correction of the default within the 90–day grace period provided in the contract. The Carters, evidently hoping to correct the default, listed the property for sale in May of 1982, but were unsuccessful in finding a buyer.

The Carters filed the present action in June 1982, alleging false representations on the part of the Riches and Kirby as to the merchantability of the title, and that the title could not be used for the Carters' financing purposes; that the Riches and Kirby falsely represented that the Cassia County lands included licensed water rights; that the Riches interfered with and prevented the attempts of the Carters to sell the property in 1982; that Kirby, as a licensed real estate broker, breached his duty to the Carters in concealing the status of title to the property and the status of the water rights. The Carters sought rescission of the contract and the return of

all monies paid by the Carters to the Riches, together with interest thereon, and special and punitive damages.

The Riches counterclaimed for termination of the contract, forfeiture of all sums paid by Carters, and alleged damages resulting from the default of Carters. Upon motion therefor the Court ordered possession of all the property to be returned to the Riches during the pendency of the action with the exception of ten acres upon which the house and dairy barn were located.[1]

Following an extensive trial the court entered findings of fact and conclusions of law denying and dismissing all claims of Carters, and granting the counterclaim of the Riches, terminating the contract, forfeiting all the Carters' payments and quieting title to the entire property in the Riches, and awarding the Riches attorney fees.

On appeal, the Carters essentially assert that at the time of the execution of the contract they were entitled to receive marketable title to the property, that marketable title was not received at that time, that such defect prevented them from obtaining financing, and that such failure to provide marketable title was a breach of the contract by the Riches; that Kirby breached his duty as a licensed real estate broker to the Carters; and that the findings of fact and conclusions of the trial judge are not supported by the evidence.[2]

The Carters first assert that the Riches could not declare a forfeiture of the contract since the Riches had materially breached the contract by failing to provide marketable title. We disagree. The district court's findings which are supported

by the evidence indicate that the Riches did not represent that title to the land was merchantable *as of the date of the contract,* but rather informed the Carters that they, the Riches, did not then have title to all the property, but rather themselves were purchasing the property by underlying contracts, and that the legal descriptions in those contracts might require certain corrections; that title to the property could not be completely obtained by the Riches prior to 1988 because of preclusions contained in the underlying contracts; that the Carter-Rich contract provided that the property was sold subject to "boundary line disputes and discrepancies in the legal description, whether recorded or unrecorded ..." which stemmed from corrections which might be necessary in the legal descriptions of the property contained in the underlying contracts; that all necessary corrections to the legal descriptions in the underlying contracts were corrected by the Riches prior to February 4, 1982. All of those findings of the trial court are amply supported by the record, not clearly erroneous, and will not be overturned on appeal. I.R.C.P. 52(a); *Ziegler v. Ziegler,* 107 Idaho 527, 691 P.2d 773 (Ct.App.1985).

The district court also held that although title to the property was not marketable at the time of the execution of the contract, the Carters were aware that the title to the property would not be obtained by the Riches prior to completion of the underlying contracts in 1988, and that the Riches would have been able to convey marketable title when required to do so under the Carter-Rich contract.

---

**1.** Carters needed some land free and clear of encumbrances to secure financing. The ten acres in question were part of the Stewart-Rich contract. At the time of the Carter-Rich contract, Stewart owned the property subject to a mortgage held by Jensen. Carters persuaded Jensen to release the mortgage. Stewart conveyed the property to Riches by warranty deed. Riches in turn deeded the ten acres free and clear to Carters. Riches claimed at trial that Carters had orally agreed to reconvey the ten acres as soon as the desired mortgages were recorded. Because Carters held a warranty deed and no written agreement existed for re-

conveyance, the trial court allowed them to remain until the question was resolved at trial.

**2.** On appeal no issue is raised concerning the trial court's findings and conclusions as to the rental value of the property during Carters' possession, and that value equaling the monies paid under the contract. Hence, cases such as *Barnard and Son, Inc. v. Akins,* 109 Idaho 466, 708 P.2d 871 (1985) (fair acre rental value) and *Blinzler v. Andrews,* 94 Idaho 215, 485 P.2d 957 (1971), *aff'd following remand, Blinzler v. Andrews,* 95 Idaho 769, 519 P.2d 438 (1973) (fair crop rental value), are not implicated.

Generally, an equitable conversion takes place when a real estate contract becomes binding on the parties. The buyer then has an interest in the property. *First Sec. Bank of Idaho, Nat. Ass'n v. Rogers*, 91 Idaho 654, 429 P.2d 386 (1967). Title to real property subject to an executory contract may be defective at the time of contracting. Title need only be perfected upon the completion of performance. *See Jensen v. Bledsoe*, 100 Idaho 84, 593 P.2d 988 (1975); *Metzker v. Lowther*, 69 Idaho 155, 204 P.2d 1025 (1949). Under an installment contract, the buyer is treated as the equitable owner of the property and normally would possess all the rights of ownership unless the contract provides otherwise. *Rush v. Anestos*, 104 Idaho 630, 661 P.2d 1229 (1983). When, however, an installment contract provides that seller will provide a title insurance policy showing marketable title free and clear from all liens and encumbrances at time of contracting or any specific time, the purchaser has a right to rely on that provision. The purchaser cannot be required "to invest further moneys into a pig in the poke." *Barnard and Son, Inc. v. Akins*, 109 Idaho 466, 708 P.2d 871 (1985).

[6] The Carters assert that the evidence indicates that the unmarketable state of the title to the property was the cause of their inability to obtain financing to lease dairy cattle, and hence precipitated their financial difficulties. Contrary to that assertion the evidence reveals that the Riches were able to, and did, correct the inaccuracies in the legal descriptions of the property and would have acquired the title pursuant to the underlying contracts. In the summer of 1981 the Carters were negotiating with FMA Agri-Leasing Co. to obtain financing for the leasing of $120,000.00 worth of dairy cattle. Testimony from representatives of FMA indicated that the Carters' financing was dependent upon FMA securing a lien position behind previous encumbrances which could not exceed $600,000.00 on the Idaho property and $100,000.00 on the Utah property. The Carters, at that time, owed $740,000.00 on the entire property, and presented no evidence to indicate they could have reduced the indebtedness to $700,000.00 as required by FMA. Further, Carters owed money on additional mortgages which they had placed on the ten-acre parcel released by the Riches.

The Carters next assert that the findings and conclusions of the trial court regarding their cause of action against Kirby, the real estate broker, are erroneous and unsupported by the evidence. We disagree. In his answer to Carters' complaint, Kirby asserted the bar of the statute of limitations, I.C. § 5–219, governing actions based in professional malpractice. At argument on summary judgment the Carters disavowed any claim against Kirby for professional malpractice and they now attempt on appeal to construct an argument regarding the standard of competence required of a licensed realtor. The Carters further argue on appeal that Kirby breached a fiduciary duty. It is sufficient to say that no evidence was offered at trial relating to any standard of competence required of licensed realtors. Likewise, no evidence was introduced indicating the existence of a fiduciary relationship between Kirby and the Carters. The record contains no evidence that the Carters asked for or received advice from Kirby. The evidence supports the finding of the trial court that Kirby was known to be the agent of the Riches during the negotiations with the Carters and that the only representations made by Kirby during those negotiations were made in good faith, with reasonable care, and based on information supplied to him by the Riches. Since we affirm the findings and conclusions of the trial court that the Riches supplied no false information, and made no fraudulent misrepresentations regarding the property, the alleged misrepresentations of Kirby are subsumed within our holding regarding the alleged misrepresentations of the Riches.

The Carters next assert that the district court erred in its findings of fact and conclusions of law regarding the Riches' alleged interference with the attempt of

the Carters to sell the Idaho property following the declaration of forfeiture. The findings of the district court are supported by substantial competent evidence and will not be overturned. The only evidence in this regard was that following the declaration of forfeiture the Carters contracted with Jay Ward, a realtor, to seek a buyer for the property at a total sale price of $990,000.00. In May 1982 one Frank Stratford requested Wayne Rich to show Stratford the property because a neighbor of the Carters had informed Stratford that the Carters were delinquent on their contract. Neither Stratford nor Rich were aware that the Carters had listed the property for sale. Rich never offered to sell the property to Stratford, and in fact informed him that he, Rich, could not sell it. When Stratford later found out that Ward was the realtor, he refused to deal with Ward. We find no error.

■ Finally, we address Carters' assertion that the trial court erred in its findings of fact and conclusions of law regarding the allegations that the Riches engaged in fraudulent misrepresentations regarding the water rights to the Idaho property. We uphold the district court's conclusions of law, albeit we disagree with those conclusions in part. The conclusions of the trial court were based in part on the theory that the Carters had a duty to investigate the truth or falsity of representations made by Jeffrey Rich to the Carters. The trial court's finding, which is supported by the evidence, was that the only representation made by Jeffrey Rich as to the water rights was the statement that in the five years he had farmed the Idaho property he always had plenty of water for irrigation. The trial court made the following findings regarding the representations as to water rights. Since 1962, wells appurtenent to the Idaho land had been used to irrigate the property, although the state had not issued licenses for all the water used to irrigate the land. There was no evidence that during the time of the Carters' possession of the Idaho property that there was ever insufficient water to irrigate. Prior to the execution of the Carter-Rich contract

the Carters had considered purchasing a different farm in Utah, but on investigating the water rights appurtenent to that farm found them insufficient and did not buy the farm. Prior to their execution of the Carter-Rich contract the Carters ascertained that the Idaho portion was in a critical ground water area as defined in I.C. § 42–233a, and the Carters knew the import of such critical ground water area designation. The Riches, however, were unaware of that critical ground water designation and the Carters never conveyed their knowledge to the Riches. The Riches were not aware of the water rights appurtenent to the Idaho property, and there was included within the provisions of the Rich-Carter contract terms pertaining to the "water rights, if any" appurtenent to the property. Although the contract was drawn by an attorney at the insistence of both the Carters and the Riches, the Carters sought the advice of still another independent attorney regarding the provisions of the contract, and particularly discussed with him the import of the "water rights, if any" language of the contract. The trial court concluded that the Riches had not, either by actual misrepresentation or by silence, misled the Carters to their detriment.

While we disagree in part with the trial court's conclusion that the Carters had a duty to investigate the truth or falsity of the representations regarding the sufficiency of the water, it is enough to state that the trial court found that the statement of Jeffrey Rich was not false. While the evidence regarding the import of Jeffrey Rich's statements contains minor conflicts between the witnesses, the trial court found that he only stated that in the past five years he had been farming the property that the water was sufficient. Hence the evidence, albeit conflicting in some regards, supports the finding of the trial court and will not be overturned. The testimony of the Carters indicates they never inquired if the water rights were licensed or decreed, nor did they claim to have made any specific inquiries at all regarding water

rights. Hence, there was no duty imposed upon the Riches to ascertain exact and precise information concerning the water, or licenses, or decrees pertaining thereto.

In sum, the judgment is affirmed. Costs to respondents Riches and Kirby. Attorney fees on appeal to Riches pursuant to the contract, and attorney fees to Kirby pursuant to I.C. § 12–121.

DONALDSON, C.J., and BAKES and HUNTLEY, JJ., concur.

BISTLINE, Justice, specially concurring in affirming the district court, disagreeing with award of attorneys' fees to both respondents:

The Carter brief informs us as follows:

4. An Earnest Money Agreement dated December 17, 1979, was prepared by Kirby, and signed by the Carters, it comprised an offer to purchase approximately 600 acres of land located in Cassia County, Idaho, and 300 acres located in Box Elder County, Utah. The lands were represented as owned by the Respondents Rich. The offer was signed by the Carters, Riches, and by Kirby as the real estate broker and agent of Riches.

5. The Earnest Money Agreement dated December 17, 1979, expressly agreed to furnish the Carters with marketable title to the real estate.

Appellants' Brief, p. 3.

The Rich brief informs us similarly:

11. Some time prior to December 17, 1979, Carter submitted an offer to Rich by means of an Earnest Money Agreement for the purchase of the Idaho and Utah property. That offer was rejected by Rich and thereafter, on December 17, 1979, a second offer by way of an Earnest Money Agreement was presented to Rich and the same was accepted by Rich.

12. Kirby with the consent and acquiescence of Carter and Rich employed attorney Jenkins of Logan, Utah, to prepare a contract for the sale of the Rich property to Carter. A draft of the contract was prepared by said attorney after he had received suggestions, requests and other input from Carter and Rich. In January of 1980, a draft of a contract was discussed by the attorney and Carters and a copy of the draft was delivered to Carters and Rich.

. . . .

17. Prior to the time Carter signed the Real Estate Installment Purchase Contract dated February 28, 1980, Carter was aware that Rich was not the owner, but was purchasing the property described therein by means of contracts.

Respondents' Brief, pp. 10–12.

Pertinent conclusions of law of the trial court are:

1. The irrigation water used to irrigate the Idaho real property was discussed between the plaintiff Scott Carter and the defendant Jeff Rich in the presence of the defendant Sherwin O. Kirby prior to the time that the Real Estate Installment Purchase Contract was prepared and executed by the parties. Such discussion was a part of the preliminary negotiations for the sale contract to be prepared.

2. All preliminary negotiations between the plaintiffs and the defendants for the sale and purchase of the real property under the contract of February 28, 1980, were merged into the contract of February 28, 1980, including any terms contained in the Earnest Money Agreement of December 17, 1979.

3. At the time the contract was prepared it clearly stated, and does not state, that the lands situated in Idaho and Utah were to be sold together, with all rights, rights-of-way, easements, water rights, if any, and appurtenances thereunto belonging or in any way appertaining to such real property.

The plaintiffs read the contract, and such contractual language, consulted with their attorney about such contractual language, and executed the contract without changing such language or requesting a change. Thus, the written contract is binding, and supersedes all

previous oral statements and/or representations made during the negotiations.

4. The contract of February 28, 1980, consummated all prior agreements and negotiations between the plaintiffs and the defendants, and such contract supersedes all previous understandings; and the intent of the parties must be ascertained from such contract, and the contract of February 28, 1980, was fully integrated. *Chapman v. Haney Seed Co.*, 102 Idaho 26, 624 P.2d 408 (1981); *Pinnacle Peak Developers v. TRW Investment Corp.*, 129 Ariz. 385, 631 P.2d 540 (1980); J. Calimari, Contracts 2d Ed., Sec. 3–1 to 3–13 (1979).

. . . .

13. The Real Estate Installment Purchase Contract dated February 28, 1980, between the defendants Rich and the plaintiffs fully documented the understandings of the parties, and reliance upon representations contrary to the specific provisions of such contract was not justified by the plaintiffs.

. . . .

18. The defendants Rich would have been able to convey good title to the real property described in the contract when the time for the conveyance of the land would have arisen, and this is sufficient, even though the title of the defendants Rich at the time they entered into the executory contract for the conveyance of the land was defective.

. . . .

22. Where a party desires to rescind on the ground of misrepresentation or fraud, he or she must, upon the discovery of the facts, at once announce his or her purpose and adhere to it. If such party continues to treat the property involved as his or her own, the right to rescission is lost and the party will be conclusively bound by the contract. 13 Am.Jur.2d *Cancellation of Instruments*, Sec. 44 (1964).

23. There was no misrepresentation or fraud by the defendants. Thus, there are no grounds for rescission of this contract. Even absent this determination, the plaintiffs' acts were inconsistent with rescission. The plaintiffs continued in possession of the real property, continued to farm it and did not contact the defendants regarding the state of the title or existing water licenses, but did request of the defendant Kirby that he assist them in finding adequate financing to obtain a dairy herd consistent with their continuing possession of the land.

24. The plaintiffs waived their right, if any, to rescind the Real Estate Installment Purchase Contract dated February 28, 1980, by their failure to promptly give notice of their intent to rescind once the grounds for rescission may have arisen, and by continuing to treat the contract as in existence.

The earnest money agreement of December 17, 1979 contains this language:

[T]he seller [the Riches] agrees to furnish good and marketable title with abstract brought to date or at Seller's opting a policy of title insurance in the name of the purchaser. . . .

Plaintiffs' Ex. 2.

The contract of February 28, 1979, however, contained this paragraph:

6. WARRANTY OF TITLE. Seller convenants and warrants that Seller shall furnish Buyer a Warranty Deed to the real property described upon full completion by Buyer of the terms and conditions of this contract and agrees to furnish lawful title free and clear of all encumbrances to the date that possession is given with the exception of those encumbrances expressly stated herein. Seller further agrees to furnish Buyer a title insurance policy naming Buyer as insured in the amount of $820,000.00 upon full completion of the terms of this contract, or at the time Seller's deed is released; Escrow Holder is hereby authorized to withhold from the final installment under this Agreement sufficient funds to purchase such a title insurance policy.

It is hereby acknowledged that Parcels 3, 4, and 5 of the above-described Cassia County Property are subject to that cer-

tain contract of sale dated July 10, 1975 between Reed S. Stewart and Ruth O. Stewart, husband and wife as Sellers and Wayne R. Rich and Gene M. Rich, husband and wife as Purchasers, which contract Sellers agree to continue to perform and satisfy. It is further understood and agreed that pursuant to said contract, Sellers, Reed S. Stewart and Ruth O. Stewart shall not obtain fee title in the subject realty of that contract until 1988.

Plaintiffs' Ex. 1.

The second paragraph of Conclusion No. 3 is somewhat disturbing. It is indeed applicable where one party to a contract attempts to modify the contract with parol evidence of other conditions and provisions. But it is not applicable to preclude parol evidence which is offered to prove false statements which are the basis of an action based on fraud in the inducement where the relief sought is equitable—to rescind— or in tort where the contract is affirmed and the relief sought is attributable to false representations or fraudulent non-disclosure.

This case is somewhat unique. Here the Carters' prayer for relief against the Riches was in the triple alternative: It sought damages against the defendants for breach of contract in the misrepresentation and warranty of the condition of the title to the real estate; it sought a decree of rescission and a restitution of monies paid; and it sought reformation of the contract and adjustment of the purchase price to reflect lack of licensed water rights. The record does not show that the defendants ever moved the court for an order requiring the Carters to elect as between what appear to be inconsistent theories. Such being the state of affairs, the district court had before it an unusual case to try. The Carters, who had demanded a jury trial, were clearly entitled to such on their tort theory for damages sounding in fraud and deceit. It can only be surmised that they

tacitly agreed that all claims and theories could be tried to the court.

The trial court's findings and conclusions are very extensive and clearly were intended to, and do, encompass all theories of the parties, including the counterclaim (more appropriately a cross-complaint) of the Riches that the contract had been terminated.

While, as stated above, it appears that doctrine of merger may have been inappropriately considered by the court, the findings and conclusions that the Carters were not justified in relying on oral statements of quality of the title on signing of the written contract on February 28 (as well as the clear covenant of the earnest money agreement as to then present marketability of the title) would appear to sustain' the trial court in denying the Carters any relief.

## II.

As presented to the trial court the case was not an easy one. The cross-complaint which asked the court to uphold the *fait accompli* forfeiture proceedings was in essence a quiet-title action. The trial court so perceived, as per paragraph 5 of the final judgment. In awarding attorney's fees to the Riches, the court went exactly contrary to the majority holding in *Ellis v. Butterfield*, 98 Idaho 644, 650, 570 P.2d 1334, 1340 (1977): "Having terminated the contract, they cannot later assert the attorney fee clause in it while defending successfully against appellants' action to reinstate the contract." *See Ellis, Id.* at 650, 570 P.2d at 1340 (Bistline, J., dissenting): "I would also grant the vendor the relief here denied him by the majority. Clearly, he deserves attorney's fees for proceedings brought to protect his rights which have been jeopardized by a defaulting purchaser."

The majority holding in the *Ellis* case precluded the district court from awarding attorney's fees to the Riches.[1] Likewise,

---

**1.** My own view, however, continues to be that the majority was wrong in *Ellis*. As was said in our most recent case, where there was a differ-

ing provision as to awarding attorney's fees, *Ayotte v. Redmon*, 110 Idaho 726, 718 P.2d 1164, 1165 (1986): "Who wins the race to the court-

as in *Ellis,* and because of *Ellis,* this Court cannot base an award of attorney's fees on a contractual provision exactly like that in *Ellis.*

In awarding substantial attorney's fees to the Riches the trial court relied on this paragraph of the contract:

COSTS OF ENFORCEMENT. If it is necessary to enforce performance under this contract by referring to an attorney, the defaulting party shall be liable for all costs incurred, including a reasonable attorney fee.

R., p. 275.

The cross-action clearly was not an action to enforce the contract, but rather to quiet title to the real estate free of any cloud on title by reason of the contract. As in the *Ellis* case, the Riches had previously terminated the contract in accordance with their contract right to do so. So, as was held by the *Ellis* majority, there was thereafter no contract in existence to enforce.

As to the Riches, as defendants, the trial court having gone the contract route on their request for attorney's fees, did not have to rule whether the case was brought frivolously, unreasonably, or without foundation.

But, as to the defendant Kirby, his claim for attorney's fees was so predicated upon Rule 54(e)(1). In denying any attorney's fees to Kirby, the trial court ruled thusly:

Although the plaintiffs did not ultimately persuade this court as to their claims, this court determines, from the facts presented to it, that the plaintiffs' claims were not brought frivolously, unreasonably or without foundation; therefore, the defendant Kirby does not have the right to an award of attorney's fees in this action.

R., p. 277.

Nothing which I see in this record persuades me that the trial court's perception of the sincerity of the Carters' claims, and the complexity of the case—made so largely by a failure of the Riches to require an

house is not dispositive of the entitlement to attorney's fees." Here, the trial court in like language reasoned that nothing in the particular

election upon the part of the Carters, was not proper. As the trial court said of the trial: "Although the plaintiffs did not ultimately persuade this Court as to their claims ...," equally true here I am not persuaded to impugn the sincerity of the appeal by ruling that it was frivolously or unreasonably brought. We will, in time, and by virtue of the majority's award of attorneys' fees to both defendants, see how much time and effort—reduced to dollars— was expended in defending against an appeal impliedly said to be frivolous, unreasonable, or without foundation.

contract provision made its application dependent upon which party was the first to file a lawsuit. R., p. 277.